IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

JOLYN L. SPECTER, as Personal
Representative of the ESTATE OF JAMES E.
SPECTER, M.D., and on behalf of herself, and
the Surviving Family Members including
KEVIN SPECTER, and DAVID W. WOOD,
JR. and MARIANNE WOOD, Individually an
on behalf of the marital community,

　　　　　　　　　　　Plaintiffs,

　　　　v.

TEXAS TURBINE CONVERSIONS, INC., a
Texas Corporation, RECON AIR
CORPORATION, a foreign corporation,

　　　　　　　　　　　Defendants.

Case No. 3:17-cv-00194-TMB

ORDER ON PARTIES'
MOTIONS IN LIMINE TO EXCLUDE
CERTAIN EXPERT TESTIMONY
(DKTS. 158, 159, 161, 174, 177, 180)

## I.　INTRODUCTION

The matter comes before the Court on six motions in limine from Texas Turbine

Conversions, Inc. ("TTC") and Recon Air Corporation ("RAC") (together, "Defendants") to

exclude the opinions of three of Plaintiffs' experts: Dr. John E. Cochran ("Cochran"), Mark A.

Pottinger ("Pottinger"), and Dr. Todd D. Coburn ("Coburn").[1]  Oral argument was requested by

TTC, however, the Court finds the matter suitable for disposition without oral argument.[2]  The

---

[1] Dkts. 180 (TTC Motion to Exclude Cochran); 174 (TTC Motion to Exclude Pottinger); 177 (TTC
Motion to Exclude Coburn); 158 (RAC Motion to Exclude Cochran); 161 (RAC Motion to
Exclude Pottinger); 159 (RAC Motion to Exclude Coburn).

[2] Dkt. 288 (Motion for Hearing).  The Court will address the motion at Docket 288 in a separate
order.

1

Motions have been fully briefed and are ready for decision.[3]  For the following reasons, the Motions at Dockets 158 and 180 are **DENIED** and the Motions at Dockets 159, 161, 174, and 177 are **GRANTED in part** and **DENIED in part**.

## II.    BACKGROUND

This action arises out of a plane crash (the "crash" or "accident") that occurred on September 15, 2015, shortly after takeoff from East Wind Lake, near Iliamna, Alaska.[4]  Plaintiffs' decedent James E. Specter, M.D., and Plaintiff David W. Wood, Jr. were passengers on the plane, a De Havilland DHC-3 "Otter" with Registration No. N928RK (the "plane" or "aircraft").[5]  The aircraft was owned and operated by Rainbow King Lodge, Inc. ("Rainbow King")[6] and piloted by John Furnia ("Pilot Furnia").[7]  Beginning in April 2014, RAC installed a short takeoff and landing

---

[3] Dkts. 180; 174; 177; 158; 161; 159; 203 (Plaintiffs' Opposition to TTC and RAC's Motions to Exclude Cochran); 200 (Plaintiffs' Opposition to TTC and RAC's Motions to Exclude Pottinger); 199 (Plaintiffs' Opposition to TTC and RAC's Motions to Exclude Coburn); 274 (TTC Reply re: Cochran); 252 (RAC Reply re: Cochran); 271 (TTC Reply re: Pottinger); 250 (RAC Reply re: Pottinger); 279 (TTC Reply re: Coburn); 264 (RAC Reply re: Coburn); 227 (TTC Joinder to Dkt. 158); 228 (TTC Joinder to Dkt. 159); 229 (TTC Joinder to Dkt. 161).

[4] Dkt. 1 at ¶ 1 (Complaint); *see also* Dkts. 17 at ¶ 1 (TTC Answer); 25 at ¶ 1 (Rainbow King Answer); 28 at ¶ 1 (RAC Answer, Third Party Complaint, and Crossclaim).

[5] Dkt. 1 at ¶ 1.

[6] Dkt. 1 at ¶ 1; *see also* Dkts. 17 at ¶ 1; 25 at ¶ 1; 28 at ¶ 1.  In addition to TTC and RAC, Plaintiffs initially brought suit against Jacob Sheely, Rodger Glaspey, Ted Sheely, and Zachary Sheely, officials at Rainbow King.  *See* Dkt. 1 at ¶¶ 1, 21.  Plaintiffs have since dismissed their claims against both the individual defendants and Rainbow King.  Dkts. 59 (Notice of Dismissal); 107 (Order of Dismissal).

[7] Dkts. 21 at ¶¶ 11–22 (TTC Third Party Complaint); 28 at 23 ¶ 8.

2

kit in the aircraft "known as Stol Kit STC SA00287NY, a Baron Stol Kit" ("STOL Kit")
manufactured by Stolairus Aviation, Inc and TTC.[8]

Plaintiffs' Complaint, filed on September 7, 2017, alleges that Defendants "caused the
aircraft to crash to the ground" because the STOL Kit "changed the center of gravity, making the
center of gravity too far aft and contributing to or causing a stall and [sic] or loss of control of the
aircraft," and that Defendants "failed to inspect, identify, and warn" of this change.[9] This theory
evolved, however, and Plaintiffs now assert that their "theory is and has been that the [aircraft]
demonstrated a tendency to right turn, roll and yaw in certain scenarios . . . [and] as a result of the
modification[s] . . . the pilot ran out of the ability to control the direction of the aircraft due to
rudder limitations and lost control of the aircraft."[10] Plaintiffs also allege that "the subject aircraft
was unreasonably dangerous due to the design and execution of the aircraft modifications and
other aircraft component parts" and that the "aircraft's failure to perform safely was a substantial
factor in causing the harm" to Plaintiffs.[11] Plaintiffs bring claims against TTC and RAC for
negligence, strict liability, negligent supervision, misrepresentation/breach of warranties, wrongful
death, and personal injury.[12]

---

[8] Dkt. 1 at ¶ 4; *see also* Dkts. 25 at ¶ 4; 28 at ¶ 4. Defendant Stolairus moved for, and this Court
granted, dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal
jurisdiction. *See* Dkts. 26 (Motion to Dismiss for Lack of Jurisdiction); 110 (Order Granting
Motion to Dismiss).

[9] Dkt. 1 at ¶ 36.

[10] Dkt. 202 at 7–8 (Plaintiffs' Opposition to TTC's Motion for Summary Judgment on Raised-But-
Not-Argued Claims (Dkt. 171)).

[11] Dkt. 1 at ¶¶ 63, 66–68.

[12] *Id.* at ¶¶ 2, 52–99.

TTC is a Texas corporation registered to do business in Decatur, Texas.[13] TTC is engaged in the business of manufacturing turbine conversion kits for the subject aircraft model.[14] RAC is a Canadian company with its principal place of business in Geraldton, Ontario, Canada.[15] RAC is one of several facilities authorized to install TTC's conversion kits.[16] RAC converted the subject aircraft to a turbine-powered airplane and installed the STOL Kit in April and May of 2014.[17]

A. *Motions in Limine to Exclude Cochran*

TTC and RAC move to exclude Plaintiffs' expert Cochran from testifying as to the cause of the plane crash and the respective obligations of TTC and RAC.[18] Defendants argue that Cochran's methodology is deficient and that his opinions would be unhelpful to the jury.[19] They also argue that Cochran disregarded "critical evidence" that has a bearing on the stability and control of the aircraft at issue.[20] Plaintiffs filed an opposition to Defendants' motions, arguing that Cochran's opinions are based on sufficient facts and reliable methodology.[21] Both TTC and RAC filed reply briefs to further elaborate on their positions.[22]

---

[13] Dkts. 1 at ¶ 24; 17 at ¶ 18; 21 ¶ 6.

[14] Dkt. 17 at ¶ 19.

[15] Dkt. 28 at 22 ¶ 1.

[16] Dkt. 17 at ¶ 21.

[17] Dkt. 163-1 at 2 (Memorandum in Support of RAC's Motion in Limine re: Airworthiness Directives).

[18] Dkts. 180; 158. TTC also joined RAC's Motion to Exclude Cochran. Dkt. 227.

[19] Dkts. 180 at 1; 158-1 at 2 (Memorandum in Support of RAC's Motion to Exclude Cochran).

[20] Dkt. 158-1 at 2.

[21] Dkt. 203.

[22] Dkts. 274; 252.

B.     *Motions in Limine to Exclude Pottinger*

TTC and RAC move to exclude Plaintiffs' expert Pottinger from testifying at trial.[23] Defendants argue that Pottinger is unqualified and that his opinions are "based on baseless conjecture."[24] They argue that Pottinger also ignored critical evidence, like testimony from Pilot Furnia.[25] Plaintiffs filed an opposition to Defendants' motions, arguing that Pottinger is qualified and that his opinions are based on sufficient facts and reliable methodology.[26] Both TTC and RAC filed reply briefs to further elaborate on their positions.[27]

C.     *Motions in Limine to Exclude Coburn*

TTC and RAC move to exclude Plaintiffs' expert Coburn from testifying at trial.[28] Defendants argue that Coburn is unqualified and that his opinions are "not the result of rigorous scientific analysis and accepted methodology."[29] Defendants also argue that Coburn's testimony will not assist the jury because the testimony "ignore[s] relevant and contradictory material facts."[30] Plaintiffs filed an opposition to Defendants' motions, arguing that Coburn is qualified

---

[23] Dkts. 174; 161.  TTC also joined RAC's Motion to Exclude Pottinger.  Dkt. 229.

[24] Dkt. 174 at 3.

[25] *Id.*

[26] Dkt. 200.

[27] Dkts. 271; 250.

[28] Dkts. 177; 159.  TTC also joined RAC's Motion to Exclude Coburn.  Dkt. 228.

[29] Dkt. 177 at 5.

[30] *Id.*

and that his testimony is both reliable and relevant to the case.[31]  Both TTC and RAC filed reply briefs to further elaborate on their positions.[32]

## III.    LEGAL STANDARD

### A.    *Motions in Limine and Federal Rules of Evidence 401 and 403*

"'A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area'"[33] and is "a well-recognized judicial practice authorized under case law."[34]  A court's power to rule on motions in limine stems from "the court's inherent power to manage the course of trials."[35]

Federal Rule of Evidence ("FRE") 401 "defines relevant evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[36]  "If evidence is relevant, it is generally admissible under [FRE] 402."[37]  "However, relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[38]

---

[31] Dkt. 199 at 2.

[32] Dkts. 279; 264.

[33] *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1162 n.4 (9th Cir. 2013) (quoting *United States v. Heller,* 551 F.3d 1108, 1111 (9th Cir. 2009)).

[34] *Smith v. County of Riverside*, No. EDCV 16-00227 JGB (KKx), 2018 WL 7500278, at *2 (C.D. Cal. Nov. 14, 2018) (citing *Ohler v. United States*, 529 U.S. 753, 758 (2000)).

[35] *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

[36] *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 953 (9th Cir. 2011) (quoting *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc)).

[37] *Id.*

[38] *Id.* (citing Fed. R. Evid. 403).

## B. Rule 702 and Daubert

FRE 702 controls the admissibility of an expert's opinion.  FRE 702, as modified in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, provides that:

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[39]

The principles of *Daubert* apply to both scientific[40] and "technical" or "other specialized" knowledge.[41]  When determining the admissibility of such evidence in advance of trial, the court undertakes a "gatekeeping" function to ensure that the jury's consideration of evidence is not contaminated by irrelevant or scientifically unsupported testimony.[42]

The Supreme Court established a two-part analysis for determining whether expert testimony is admissible: (1) "the trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

---

[39] Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (*Daubert I*).

[40] *Daubert I*, 509 U.S. at 595.

[41] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

[42] *See United States v. Alatorre*, 222 F.3d 1098, 1100–03 (9th Cir. 2000); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019).

Case 3:17-cv-00194-TMB   Document 313   Filed 12/04/20   Page 7 of 30

reasoning or methodology properly can be applied to the facts in issue,'" i.e., whether the proffered testimony is reliable; and (2) the trial court "must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact."[43]

The reliability inquiry is "a flexible one."[44] Several factors can be used to determine the reliability of expert testimony: (1) "whether a theory or technique can be tested"; (2) "whether it has been subjected to peer review and publication"; (3) "the known or potential error rate of the theory or technique"; and (4) "whether the theory or technique enjoys general acceptance within the relevant scientific community."[45]

The relevancy inquiry requires the court to ensure that the proposed expert testimony is "relevant to the task at hand," i.e., that it "logically advances a material aspect of the proposing party's case."[46] Once an expert "meets the threshold established by [FRE] 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give that testimony."[47]

---

[43] *United States v. Finley,* 301 F.3d 1000, 1008 (9th Cir. 2002) (quoting *Daubert I,* 509 U.S. at 591–93); *Estate of Barabin v. AstenJohnson Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) ("We have interpreted Rule 702 to require that '[e]xpert testimony . . . be both relevant and reliable.'") (quoting *United States v. Vallejo,* 237 F.3d 1008, 1019 (9th Cir. 2001)).

[44] *Kumho Tire*, 526 U.S. at 150.

[45] *United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94).

[46] *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II* "); *Estate of Barabin*, 740 F.3d at 463; *Primiano*, 598 F.3d at 656 ("'Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'") (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).

[47] *Primiano*, 598 F.3d at 565; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("'The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.'") (internal alterations omitted) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013)).

## IV.   DISCUSSION

The Court will discuss the Motions relating to experts Cochran, Pottinger, and Coburn in the sections below.

### A.   Defendants' Motions in Limine to Exclude Cochran

For the following reasons, Defendants' Motions in Limine at Dockets 158 and 180 to exclude Cochran's expert testimony are **DENIED**.  The Court finds that Cochran is qualified and that his proffered testimony meets the *Daubert* standard, namely, the testimony is both reliable and relevant in this case.

Plaintiffs retained Cochran "to apply [his] education and experience in aerospace engineering and experience in aircraft accident analysis to the facts of the accident" in this case, and to "provide opinions as to the cause, or causes, of the accident."[48]  Cochran has an extensive CV, which includes serving as a professor at Auburn University for over fifty years.[49]  He served as Head of the Department of Aerospace Engineering at Auburn from 1993 to 2013, published in peer-reviewed journals on numerous topics in his field, and has testified as an expert in other cases.[50]  His academic specializations include "dynamics, guidance, stability, and control of airplanes, helicopters, missiles, and launch vehicles."[51]

Cochran offers five opinions regarding the subject accident:

> **Opinion 1.**  The accident aircraft…crashed because its stability and control characteristics had been changed by the STCs of [TTC] and Stolairus, which

---

[48] Dkt. 158-4 at 5 (Cochran Expert Report).

[49] *Id.* at 3.

[50] *Id.*; Dkt. 158-4 at Appendix A (Cochran CV).  Cochran was previously qualified as an expert in *In re Crash of Aircraft N93PC*, No. 3:15-cv-0112-HRH, 2020 WL 1956823, at *3–6 (D. Alaska Apr. 22, 2020) (Dkt. 365).

[51] Dkt. 158-4 at 3.

were implemented by [RAC], that changed the engine and propeller and the wing, respectively, of the accident aircraft so that the pilot was unable to control it during an attempted takeoff from East Wind Lake.

. . .

**Opinion 2.** [TTC] failed to consider whether the empennage of the original DHC-3 Otter aircraft should be modified in developing the details of the conversion to the Honeywell engine and Hartzell propeller.

. . .

**Opinion 3.** [TTC] failed to instruct pilots of N928RK through the Aircraft Flight Manual Supplement TTC-FMS-1, Revision D, and by other appropriate means, regarding the changes in the flight characteristics and handling qualities of N928RK due to the Honeywell engine and Hartzell propeller.

. . .

**Opinion 4.** [TTC] failed to warn pilots of N928RK through the Aircraft Flight Manual Supplement TTC-FMS-1, Revision D, and by other appropriate means, that the changes in the stability and control characteristics of N928RK due to the Honeywell engine and the Hartzell propeller could result in unpredictable handling qualities of the aircraft.

. . .

**Opinion 5.** [TTC] had actual knowledge that the changes made in the accident aircraft . . . would change the performance characteristics of the accident aircraft because it advertised the new performance characteristics . . . [TTC] had actual and/or constructive knowledge that the changes in performance of the accident aircraft would change the stability and control characteristics of the aircraft.[52]

Cochran supports his opinions by analyzing the changes to the aircraft made by TTC and RAC, the flight path that preceded the crash, flight test data, deposition testimony, and the Aircraft Flight Manual Supplement ("AFMS"), among other information.[53]

---

[52] Dkt. 158-4 at 23–25.

[53] *Id.*

TTC argues that Cochran's opinions should be excluded because they are not based on sufficient facts or the product of a reliable methodology.[54] TTC argues that Cochran's assumptions and "narrow assignment" are in contravention of the evidence in this case.[55] TTC asserts that Cochran should have considered alternative causes of the accident, such as Pilot Furnia's actions, the weight and balance issues, or the "dark-night conditions," and that his failure to do so is fatal to his testimony.[56] Finally, TTC argues that Cochran is not qualified to offer opinions two through five.[57] RAC makes substantially similar arguments and moves on the same basis.[58]

Plaintiffs object to TTC and RAC's motions.[59] Plaintiffs argue that Cochran is qualified to offer testimony on the proffered subjects, and that he based his opinion on well-established principles.[60] They note that Cochran performed his own weight and balance calculations and that he followed the same methodology used by the National Transportation Safety Board ("NTSB").[61] In response to Defendants' criticism that Cochran did not consider alternative causes of the crash, Plaintiffs argue that "Cochran's opinion is relevant to explain why the crash occurred whether or

---

[54] Dkt. 180 at 14.

[55] *Id.* at 15–16.

[56] *Id.* at 18–24.

[57] *Id.* at 25–34.

[58] Dkt. 158 at 2 ("Cochran's limited analysis and opinion fails to meet the standard for admissibility[.]"). The Court's analysis applies to the arguments presented by both Defendants, unless otherwise noted.

[59] Dkt. 203.

[60] *Id.* at 7–8.

[61] *Id.* at 9.

not the plane was loaded too far aft."[62]  They argue that Defendants' criticisms do not go to admissibility, but to the weight of the parties' competing theories.[63]  Finally, they argue that, based on his CV and experience in aerospace engineering, Cochran is fully qualified to offer opinions two through five, and supported his opinions with valid methodology and reasoning.[64]  The Court agrees.

The Court finds that Cochran's proffered testimony is both reliable and relevant.  Cochran is qualified.  He is an aerospace engineer with over fifty years of experience and has a specialization in the dynamics, guidance, stability, and control of airplanes.[65]  He has taught courses in multiple subject areas directly relevant to issues in this case, including "Dynamics of Flight," "Airplane Design," "Airplane Static Stability and Control" and "Aerospace System Analysis."[66]  Contrary to Defendants' assertions, Cochran's experience in these specializations, and general experience as a professor of aerospace engineering, is sufficient to qualify him to provide the five opinions in his report.

Next, the Court finds that Cochran's methodology is reliable.[67]  Cochran analyzes the modifications made to the subject aircraft by TTC and RAC and examines the impact of those

---

[62] *Id.* at 10.

[63] *Id.*

[64] *Id.* at 15–18.

[65] Dkt. 158-4 at 3.

[66] *Id.* at 34.

[67] *See In re Crash of Aircraft N93PC*, No. 3:15-cv-0112-HRH, 2020 WL 1956823, at *5 (Dkt. 365 at 13) (finding that Cochran's application of "well-established aerodynamic formulas and principles" make his opinions reliable).

modifications on the aerodynamics of the plane.[68]  For example, Cochran explains how the increased horsepower of the new engine is counteracted by other features of the plane.[69]  He discusses how modifications to the plane impacted the p-factor and potential for uneven lift (more lift on a portion of the left wing than right).[70]  Cochran applies engineering principles to calculate with some precision the impacts of the plane modification on its flight characteristics.[71]  He concludes by analyzing the flight test data, AFMS, and the accident aircraft's flight path.[72]  Cochran's opinion is a fair expression of the facts that he reviewed.  And his application of established aerodynamic principles and formulas to the record meets the reliability threshold.

Defendants argue that Cochran's methodology is faulty because it did not consider alterative causes of the accident.[73]  The Court disagrees.  The Court does not read Cochran's analysis to rule out every other possible cause for the accident, only that the stability and control characteristics were changed by TTC (and RAC as installer) such that the plane became harder to control and was a cause of the crash.  As Defendants point out, Cochran at his deposition characterized his opinion as being "a factor" and a "contributing cause," which is consistent with Plaintiffs' assertion that Cochran's opinion is relevant to determining causation "whether or not the plane was loaded too far aft."[74]  Defendants may object at trial should Cochran assert that the

---

[68] Dkt. 158-4 at 8–22.

[69] *Id.* at 10–12.

[70] *Id.* at 14–15.

[71] *See, e.g.*, Dkt. 158-4 at 10–12.

[72] *Id.* at 17–20.

[73] Dkt. 180 at 18.

[74] Dkts. 180 at 22; 203 at 10.

plane modifications were the *only* cause of the crash, since that is not an opinion asserted by Cochran in his report and would be inconsistent with Plaintiffs' characterizations of Cochran's testimony in this case.[75]  Finally, Defendants' citation to *Claar v. Burlington N.R. Co.*, does not inform the outcome in this instance.[76]  *Claar* does not stand for the proposition that an expert must consider alternative causes of the crash; it merely stands for the proposition that experts must explain the basis for their conclusions.[77]  The experts in *Claar* provided no evidence to support their conclusions other than "subjective belief and unsupported speculation."[78]  Here, Cochran provides ample analysis and explanation for his opinions, which derive from the application of his expertise to the facts in this case.  Defendants' objections go to the weight of Cochran's opinions, not their admissibility.[79]

Cochran's proffered opinions are also relevant to the theories at issue in this case.  He analyzes the changes made to the plane by TTC and RAC and reaches conclusions about whether

---

[75] *See* Dkt. 203.  Plaintiffs argue that other causes are out of scope—for example, that the "mathematical calculations…have nothing to do with Dark Night Conditions."  *Id.* at 14.  Any potential testimony by Cochran that rules out Defendants' alternative causes as a contributing cause would be out of scope and not appropriate.

[76] 29 F.3d 499 (9th Cir. 1994).

[77] *Id.* at 502.

[78] *Id.*; *see also Kennedy v. Collagen Corp.*, 161 F.3d 1126, 1230 (9th Cir. 1998) ("[C]ausation need not be established to a high degree of certainty for expert testimony to be admissible under [FRE] 702.").

[79] *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1018 n.14 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)); *In re Crash of Aircraft N93PC*, No. 3:15-cv-0112-HRH, 2020 WL 1956823, at *6 (Dkt. 365) (denying defendants' motion in limine to exclude Cochran and reasoning that many of the objections to Cochran's testimony can be addressed on cross examination).

14

those changes were a contributing cause to the crash.[80]  He also reviews the flight testing data and disclosures in the AFMS to form opinions about whether the changes made to the plane should have been scrutinized in more detail (i.e. through more testing) or whether the information provided to pilots through the AFMS adequately captured how the engineering changes might impact the plane's flight characteristics.[81]  These opinions are directly relevant to TTC and RAC's potential liability on Plaintiffs' negligence and strict liability causes of action.  Cochran's opinions will assist the jury in evaluating the factual record and many of the complex concepts at issue in this case.

The Court finds that Cochran's testimony is reliable and relevant, meets the *Daubert* standard, and is not otherwise inadmissible under FRE 403 or any other rule.  For the foregoing reasons, Defendants' Motions at Dockets 158 and 180 are **DENIED**.

B. *Defendants' Motion in Limine to Exclude Pottinger*

For the following reasons, Defendants' Motions at Dockets 174 and 161 are **GRANTED in part** and **DENIED in part**.  The Court finds that Pottinger is qualified to analyze the crash and opine on the cause or causes of the crash based on his experience as an Aviation Accident Investigator and Reconstructionist.[82]  However, the Court finds that Pottinger is not qualified to opine on other topics including the legal, regulatory, or testing obligations of TTC or RAC, or any duty to warn imposed upon TTC or RAC.

---

[80] Dkt. 158-4 at 21.

[81] *Id.* at 22–23.

[82] *See* Dkt. 174-1 (Pottinger CV).

Pottinger practiced law as a trial attorney from 1989 to 2013, prior to becoming an expert witness in aviation accidents.[83]  Specifically, Pottinger describes himself as being an "Aviation Accident Investigator/Reconstructionist" who analyzes data to determine the cause or causes of aviation accidents.[84]  Pottinger is not an engineer, an academic, or a professional pilot.[85]  His expertise in this area stems from his training at the University of Southern California in the Viterbi School of Engineering, where he received an Aviation Accident Investigation Certificate.[86]  He applies a methodology used by the NTSB to investigate accidents, "where you approach every accident or incident with all issues or potential causes on the table, and then you systematically attempt to eliminate those various potential causes until you're left with the ultimate cause."[87]  Pottinger lists numerous investigations in which he participated.[88]

Pottinger provides several opinions in his expert report as to the obligations of TTC and RAC and the causes of the crash in this case.[89]  Specifically, Pottinger makes the following conclusions:

> 1. The subject aircraft was modified with a turbine conversion that did not meet [Civil Air Regulation ("CAR")] 3.120 performance standards during power on, flaps deployed stalls.

---

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] Dkt. 200 at 12; *see also* Dkt. 161-5 at 1 (stating that Pottinger uses "the methods and practices set forth in the International Civil Aviation Organization, Annex 13, as implemented by the National Transportation Safety Board. . .").

[88] Dkt. 174-1.

[89] Dkt. 161-5 at 40 (Pottinger Expert Report).

16

2. TTC[] did not undertake further modifications to the airframe or operating instructions to make the turbine modified aircraft perform consistently with CAR 3.120.

3. The TTC[] FMS did not adequately describe or warn pilots respecting the failure of the TTC[] turbine aircraft to perform consistent with CAR 3.120. There is no instruction as to what to do in the event a stall is experienced. There were no limitations placed by TTC[] on the use of takeoff flaps.

4. TTC[] did not test the compatibility of the turbine conversion with the Baron STOL kit or the installed float system.

5. With respect to controllability at high angles of attack, [RAC] did not evaluate the compatibility of the STOL kit with the turbine conversion.

6. Had [RAC] made an inquiry, it would have learned that under certain conditions rudder authority was being lost prior to stall; and, that the STOL kit would have increased the airspeed difference between stall and loss of rudder authority in power on, high angle of attack flight conditions.

7. The weight and balance condition of the aircraft was not a factor in the crash.

8. After takeoff the aircraft increased pitch and entered into a high angle of attack flight condition.

9. The aircraft experienced increased torque, slipstream and [p] factor during the high angle of attack flight condition, which in turn introduced a right yaw tendency which the pilot attempted to counteract by pushing on the left rudder pedal.

10. The high angle of attack adverse yaw on the TTC[] turbine equipped aircraft is greater than on the aircraft as originally equipped.

11. Pilot Furnia ran out of rudder authority during the high angle of attack maneuver, the aircraft yawed right, entered uncoordinated flight, and stalled or left controlled flight, consistent with what was observed during TTC[] flight testing.

12. Had the pilot had full rudder authority as contemplated by CAR 3.120, he would not have lost control in the manner he did. If the aircraft had stalled while in coordinated flight the recovery would have been faster, without the change of direction observed in the ground track data, likely avoiding the impact with the water.

13. The aircraft descended, struck the water, and damaged the left float.

17

14. The aircraft ascended a second time, this time with adverse yaw from the damaged float.

15. During the second ascent the aircraft stalled and contacted the ground.[90]

Pottinger reviewed NTSB data, flight test data, the AFMS, marketing materials, witness statements, the engine design, and photos and data from the wreckage.[91] Pottinger typically reviews physical evidence in trying to determine a cause of the crash.[92]

TTC opposes Pottinger's proffered testimony, arguing that he is not qualified and that his opinions are not reliable or relevant.[93] TTC argues that Pottinger is not qualified because he is not an engineer, has no experience with Supplemental Type Certificates ("STCs"), has no experience with the DHC-3 Otter or floatplanes in general, has not published any aviation articles, and has no experience as a flight test pilot.[94] TTC argues that Pottinger has no scientific basis for his theory that Pilot Furnia ran out of rudder and that Pottinger ignores Pilot Furnia's testimony in this case.[95] TTC accuses Pottinger of cherry-picking flight test data to make his case and objects to Pottinger's assertions regarding TTC and RAC's duties.[96] RAC makes substantially the same arguments in its Motion.[97]

---

[90] *See* Dkt. 161-5 at 39–41 (numbered for clarity).

[91] *Id.*

[92] Dkt. 200 at 13 (citing Pottinger's testimony in a different case).

[93] Dkt. 174 at 3.

[94] *Id.* at 4–8.

[95] *Id.* at 9.

[96] *Id.* at 34–39, 43–44.

[97] Dkt. 161-1 (Memorandum in Support of RAC's Motion in Limine to Exclude Pottinger). The Court's analysis applies to arguments made by both Defendants, unless otherwise noted.

In opposition, Plaintiffs argue that Pottinger is qualified and that Defendants' objections go to the weight of Pottinger's testimony as opposed to the admissibility of it.[98] Plaintiffs argue that Pottinger exceeds the low bar required for him to be qualified.[99] They point to his experience investigating accidents and characterize it as "broad experience and involvement in aircraft accident issues."[100] Plaintiffs also argue that Pottinger's testimony is well grounded in the facts and he is qualified to testify as to the duties of TTC and RAC.[101]

Moving to the merits, the Court finds that Pottinger is qualified as to his opinions that relate to analyzing the crash and its cause, but not as to other topics such as the legal, regulatory, or testing obligations of TTC or RAC, or any duty to warn imposed upon TTC or RAC. Specifically, Pottinger is qualified to testify as to opinions 7–15, but not qualified to testify as to opinions 1–6, as outlined above. Pottinger may use flight data, the AFMS, and other information to inform his opinion, provided his use of that information does not result in him providing opinions about the duties or obligations of TTC or RAC.

Pottinger is a trial lawyer who in a second career has gained experience analyzing accidents, perhaps in a similar manner to an investigative employee of the NTSB. The Court gives weight to Defendants' concerns regarding the mismatch between Pottinger's qualifications and the broad scope of his proffered testimony. While FRE 702 and Ninth Circuit law "contemplate a broad conception of expert qualifications," here Pottinger has offered *no* relevant qualifications to

---

[98] Dkt. 200 at 2–3.

[99] *Id.* at 4–6.

[100] *Id.* at 7–8.

[101] *Id.* at 10, 18–28.

opine on certain subjects.[102]  While Pottinger need not have extensive formal training or advanced degrees, as Defendants would like to see, Pottinger's experience is not broad or deep enough in this case.[103]  Pottinger's experience since 2013 is limited to his work as an Accident Investigator, which involves analyzing physical evidence and data to determine the cause or causes of a plane crash.[104]  This expertise may be helpful to a jury in determining the cause or causes of the crash and Pottinger may properly provide testimony on that basis.  However, Plaintiffs have not met their burden to show that Pottinger is qualified to opine on the duties or obligations of TTC or RAC.  Pottinger's CV and Report do not elaborate on experience that may be relevant to those topics, such as experience in the aviation industry, experience with STC approvals, engineering background, regulatory background, or specific experience as a pilot, to name a few.  As a result, Pottinger's testimony must be limited.

Because the Court concludes that Pottinger is qualified to testify as to the cause of the crash based on his experience as an Accident Investigator, the Court now analyzes whether the proffered testimony is reliable and relevant and finds that it meets both requirements.

Pottinger offers opinions as to the cause of the crash, namely, that Pilot Furnia ran out of rudder authority and lost control of the plane, which then subsequently crashed.[105]  He analyzes flight test data, the flight path, testimony from Pilot Furnia, wreckage information, and the NTSB

---

[102] *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation omitted); *Kumho Tire Co.*, 526 U.S. at 152 (a court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

[103] *See Hangarter*, 373 F.3d at 1015–16.

[104] Dkt. 174-1.

[105] Dkt. 161-5 at 39–41

Performance Study, among other information, to underpin his opinions.[106]  Defendants argue that Pilot Furnia contradicts Pottinger's opinions, however, Defendants can raise these arguments on cross examination.[107]  Even without the testimony of Pilot Furnia, Pottinger has a sufficient—though not overwhelming—factual basis to meet the *Daubert* standard.[108]  Finally, the Court finds that his opinions are relevant to TTC and RAC's potential liability on Plaintiffs' negligence and strict liability causes of action.  Pottinger's opinions will assist the jury in evaluating the factual record, specifically, the series of events that transpired on the day of the crash and the potential cause or causes of the crash.

The Court finds that Pottinger's testimony, as limited by the analysis above, is reliable and relevant, meets the *Daubert* standard, and is not otherwise inadmissible under FRE 403.  For the foregoing reasons, Defendants' Motions at Dockets 161 and 174 are **GRANTED in part** and **DENIED in part**.

C.      *Defendants' Motion in Limine to Exclude Coburn*

For the following reasons, Defendants' Motions at Dockets 159 and 177 are **GRANTED in part** and **DENIED in part**.  The Court finds that Coburn is qualified to testify on all issues discussed in his report, subject to the limitations discussed below,[109] and that his opinions meet

---

[106] *Id.*

[107] Dkt. 174 at 9; *see Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188–89 (9th Cir. 2002) (objections to analysis often go to the weight of the evidence, not admissibility).  Defendants can similarly raise their criticisms of Pottinger's analysis, like his use of flight test data or lack of independent tests relating to STOL kit modifications, on cross examination.  *See* Dkt. 174 at 34–38.

[108] For example, Pottinger discusses the flight data, wreckage information, and information about the configuration of the aircraft.

[109] Dkt. 177-1 (Coburn Expert Report).

21

the standards of reliability and relevancy required by *Daubert*. The Court finds that the "Assessment of Crash Data" section of Coburn's Report, and related opinions and conclusions, are not reliable and should be excluded under *Daubert*. Further, the Court finds that Coburn's testimony must be limited consistent with the Court's order addressing Docket 163, which concerns certain airworthiness directives and flight manual supplements.[110]

Coburn is an Associate Professor of Aerospace Engineering and worked at Boeing in multiple roles between 1987 and 2012.[111] He has a B.A. in Mechanical Engineering, M.S. degrees in Mechanical Engineering and Mathematics, and a Ph.D. in Engineering and Applied Industrial Mathematics.[112] He is a Designated Engineering Representative for the FAA, meaning, he is delegated by the FAA to evaluate engineering data and ensure it complies with appropriate airworthiness standards.[113] He has also worked on several publications including handbooks, a lab manual, and other engineering-related studies.[114] According to Plaintiffs, this is the first case in which Coburn has served as an expert.[115]

---

[110] To the extent Defendants oppose references to Airworthiness Directives not covered by the Court's order addressing Docket 163, they can object at trial.

[111] Dkt. 177-2 at 1 (Coburn CV).

[112] *Id.*

[113] *Id.*

[114] *Id.* at 2.

[115] *See* Dkt. 199 at 4.

Coburn's proffered testimony focuses on flight test data, manufacturer claims regarding performance, user expectations of performance, and the aircraft's behavior during the crash.[116] Coburn makes the following conclusions:

1. The aircraft was handled, loaded, and flown in the same manner as done on other flights, and that expectations of the parties involved were that the converted aircraft would handle the same as a standard DHC-3 Otter, or better.

2. The aircraft experienced a stall during takeoff, causing the aircraft to touch down before taking off again, veering right, and crashing into the tundra.

3. There was no warning of impending stall before touchdown and subsequent crash.

4. The stall characteristics of the aircraft with the combined modifications of the [TTC] turboprop, the Stolairus STOL kit, the Upgross Kit, and the Floats was not sufficiently understood nor documented.

5. Airworthiness Directives issued by the FAA and by Transport Canada to modify the flight limitations for DHC-3 Otters with the [TTC] turboprop and Stolairus STOL kit conversions show that the Flight Testing did not adequately define the flight characteristics of the Converted aircraft.

6. The actual flight testing of the DHC-3 Otter with the [TTC] & Stolairus conversions fell short of defining the flight characteristics sufficiently such that unacceptable performance could be avoided.

7. Claims by Stolairus in its Flight Manual Supplement #4 for the Baron STOL Kit on the Converted DHC-3 aircraft that the Baron STOL Kit is compatible with any engine (piston or turbine) & any wheel, ski, or float configuration appear completely unsubstantiated.

8. DHC-3 aircraft with the [TTC]/Stolairus Conversions may have as much as six times the number of crashes per aircraft per year relative to the unconverted DHC-3 aircraft.

9. [TTC] and Stolairus claim improved performance with their modifications in their Flight Manual Supplements. Yet these claims are proven false.

10. [TTC] & Stolairus certification effort was not sufficient to verify the flight performance of the aircraft.

---

[116] Dkt. 177-1 at 1–6.

11. The FAA Airworthiness Directive issued against the converted aircraft back in 2012 should have alerted [TTC] and Stolairus about the shortfalls. Yet instead of initiating investigative tests, they seemed to ignore and to challenge the concerns.[117]

Coburn reviewed flight test data, flight manuals, FAA regulations and Airworthiness Directives, crash data, the AFMS, marketing information, NTSB witness interviews, and other NTSB data.[118]

TTC seeks to exclude Coburn from testifying because he is unqualified and his opinions are unreliable and will fail to assist the jury.[119] TTC argues that Coburn is unqualified because this is the "first time that Coburn has been retained to investigate the cause(s) of any aviation accident," is "wholly unfamiliar with the subject aircraft," has no flight testing experience, and is not an aviation mechanic.[120]

TTC then objects to Coburn's opinions on various topics. It first argues that Coburn's use of flight testing is unreliable because Coburn fails to provide analysis of how more or different flight testing "would have prevented this accident," ignores the fact that the plane was overloaded and had a changed center of gravity, was unfamiliar with whether the subject aircraft was equipped with a "stall horn or warning light," and that he does not provide sufficient (or in some cases, any) basis for his opinions.[121] Second, TTC argues that Coburn's opinion regarding the Flight Manual Supplement No. 4, Revision 2 fails to consider all evidence and that the regulatory directive on

---

[117] Dkt. 177-1 at 6–8 (numbered and summarized for clarity).

[118] *Id.* at 1–8.

[119] Dkt. 177 at 1–2.

[120] *Id.* at 9–14.

[121] *Id.* at 16–26.

which Coburn bases his opinion had no applicability.[122]  Third, TTC argues that Coburn's assessment of regulatory authority is not relevant and not applied correctly.[123]  Fourth, it argues that Coburn's assessment of crash data, which relies in part on a Wikipedia entry, is based on unscientific and insufficient data, and fails to consider a multitude of other information to provide proper context.[124]  Fifth, TTC states that Coburn's assessment of manufacturer claims and user expectations of performance are without sufficient evidence and overlooks other evidence.[125]  Finally, TTC argues that Coburn's assessment of aircraft behavior—that the aircraft stalled—does not take into account operating conditions or key evidence such as the "illegal configuration" of the aircraft or Pilot Furnia's testimony.[126]  RAC makes substantially the same arguments, but adds that Coburn fails to offer opinions that specifically implicate or pertain to RAC.[127]

Plaintiffs oppose Defendants' motions.[128]  They argue that Coburn is qualified by virtue of his academic credentials and extensive experience as an engineer and reiterate that the *Daubert* standard is not a rigid one.[129]  Plaintiffs then argue that Coburn's testimony is well grounded in

---

[122] *Id.* at 27–30.

[123] *Id.* at 30–31.

[124] *Id.* at 32–34.

[125] *Id.* at 35–40.

[126] *Id.* at 40–45.

[127] *See* Dkt. 159-1 at 7–9 (Memorandum in Support of RAC's Motion in Limine to Exclude Coburn).  The Court's analysis applies to the arguments made by both Defendants, unless otherwise noted.

[128] Dkt. 199.

[129] *Id.* at 3–6; *see Daubert I*, 509 U.S. at 594.

25

the facts and that Coburn properly considered facts including the flight test data, flight manual, crash data, marketing materials, user expectations, and aircraft behavior.[130]

The Court agrees and finds that Coburn is qualified. Coburn may testify as to the opinions contained in his Report, except for those included in the "Assessment of Crash Data" section and his related opinions and conclusions. Coburn is qualified by virtue of his academic credentials—he is a professor of aerospace engineering—and his more than twenty-five years working as an engineer for Boeing.[131] FRE 702 "contemplates a broad conception of expert qualifications," which can include significant knowledge and experience within an industry.[132] Although Defendants provide several criticisms of Coburn's background and argue that he lacks specific experience with the DHC-Otter aircraft, for example,[133] FRE 702 and courts' interpretation of it do not contemplate such narrow tailoring of expert qualifications.[134] Here, Coburn's experience in the field of aerospace engineering is sufficient to qualify him as an expert in this case. At Boeing, Coburn supported engineering teams that evaluated aircraft structures and conducted component testing.[135] He directed analysis relating to damage tolerance and stress tolerance.[136]

---

[130] Dkt. 199 at 11–21.

[131] *See* 177-2 at 1.

[132] *See Hangarter*, 373 F.3d at 1015–16.

[133] *See* Dkt. 177 at 6–16.

[134] *See Hangarter*, 373 F.3d at 1015 ("Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert") (citation omitted); *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) ("[a] lack of specialization may go to weight . . . 'as long as an expert stays within the reasonable confines of his subject area.'") (citation omitted).

[135] Dkt. 177-2 at 1.

[136] *Id.*

In his deposition, he stated that he "looked at full crashes" and has "done crash worthiness analysis."[137]  While he admits that most of his work is "analytical" as opposed to "testing," his analytical experience lends credibility to his opinions.[138]  Additionally, as a Designated Engineering Representative for the FAA, Coburn is entrusted with evaluating engineering data and ensuring it complies with appropriate airworthiness standards—i.e. he is familiar enough with the basic contours of regulatory rules to render informed opinions.  Finally, Defendants may cross examine Coburn at trial about his qualifications and opinions.[139]

The Court next considers whether Coburn's proffered testimony is reliable, and, finds that it is.  Coburn underpins his opinions with many of the same facts marshaled by Cochran and Pottinger, namely, flight test data, NTSB interviews and factual information, marketing materials, regulatory information, and data captured by the plane before the crash.[140]  This is the type of information that an engineer would reasonably use to evaluate the performance and handling qualities of an aircraft.  Coburn relies on his experience in the aerospace industry and as an academic to analyze the facts and reach his conclusions.  Defendants take the same position here as with Cochran and Pottinger's reports, that Coburn did not take into account all facts, ignored contradictory evidence, and as a result is unreliable.  The Court finds that Defendants' objections are more appropriately aired through cross examination, since that is the appropriate venue for the "presentation of contrary evidence" and attacking what Defendants believe to be "shaky" evidence

---

[137] Dkt. 177-3 at 15.

[138] *Id.* at 34–35.

[139] *See Daubert I*, 509 U.S. at 595–96.

[140] *See* Dkt. 177-1.

or reasoning.[141]  Finally, the Court finds that Coburn's opinions are relevant to TTC and RAC's potential liability on Plaintiffs' negligence and strict liability causes of action.  Coburn's opinions, except as discussed below, will assist the jury in evaluating the factual record.

The Court, however, does not find Coburn's methodology and analysis relating to crash data to be reliable and concludes that it should be excluded.  Coburn cites Wikipedia and NTSB Crash Data to make the conclusion that DHC-3 Otters crash at about six times that of non-converted aircrafts.[142]  First, Wikipedia is a suspect authority, unreliable, and has been treated as such by numerous courts.[143]  Plaintiffs contend that the Wikipedia statistic is acceptable because Defendants have "offer[ed] no other number or suggestion that the number is wrong."[144]  Defendants do not bear the burden of disproving alleged facts where the source is unreliable.  Second, even if Coburn's Wikipedia information were admissible, Coburn's methodology is unreliable and incomplete, so much so that his testimony must be excluded.  Coburn performs simple arithmetic to reach his conclusion that converted DHC-3 Otters crash at six times that of

---

[141] *Daubert I*, 509 U.S. at 596; *see Hemmings*, 285 F.3d at 1188–89 (objections to analysis often go to the weight of the evidence, not admissibility).

[142] Dkt. 177-1 at 4.

[143] *See, e.g.*, *Hasbro, Inc. v. Sweetpea Enter., Inc.*, CV 13-3406-DMG (JCGx), 2014 WL 12580250, at *3 (C.D. Cal. Feb. 25, 2014) (anonymously-authored Wikipedia page is unreliable); *Great W. Air, LLC v. Cirrus Design Corp.*, No. 2:16-CV-02656-JAD-EJY, 2019 WL 6529046, at *7 (D. Nev. Dec. 4, 2019) ("Wikipedia . . . is not a reliable source of data.") (citing *Kole v. Astrue*, No. CV 08–0411–LMB, 2010 WL 1338092, at *7 n.3 (D. Idaho Mar. 31, 2010) ("Wikipedia is not a reliable source at this level of discourse.")).

[144] Dkt. 199 at 15.

28

the unconverted Otters.[145]  He divides the number of crashes per type of aircraft per the number of years that crashes were recorded and then compares the resulting rates.[146]

Defendants raise several persuasive arguments that demonstrate the shortcomings of Coburn's methodology.  First, they point out that NTSB data is limited (since it only investigates accidents in the United States) and thus inherently incomplete.[147]  Second, they argue that the relative frequency of crashes is not dispositive of a design defect.[148]  And third, they argue that Coburn's analysis fails to contextualize the "crash rate" by controlling for hours flown or the operating conditions of the crashes.[149]  The Court agrees.  The Court also finds that, given the limitations of the analysis, it would be unhelpful to the jury and would run the risk of unfairly prejudicing Defendants.  Therefore, Coburn is precluded from testifying about the crash data as outlined in the "Assessment of Crash Data" section of his report, also listed as conclusion eight above, and any related opinions or conclusions.[150]

The Court finds that Coburn's testimony, as limited by the analysis above, is reliable and relevant, meets the *Daubert* standard, and is not otherwise inadmissible under FRE 403.  For the foregoing reasons, Defendants' Motions at Dockets 159 and 177 are **GRANTED in part** and **DENIED in part**.

---

[145] Dkt. 177-1 at 4.

[146] *Id.*

[147] Dkt. 177 at 33.

[148] *Id.* at 34.

[149] *Id.* at 34.

[150] The Court's findings apply with equal force to relevant analysis in Coburn's "Response to Timmons' Report" at Dkt. 199-4.

Case 3:17-cv-00194-TMB   Document 313   Filed 12/04/20   Page 29 of 30

## V. CONCLUSION

Experts Cochran, Pottinger, and Coburn are permitted to testify consistent with the analysis above.  To the extent Defendants' motions are denied, Defendants are permitted to renew their objections at trial.  Accordingly, for the foregoing reasons,

(1) Defendants' Motions to exclude Cochran's expert testimony at Dockets 158 and 180 are **DENIED**;

(2) Defendants' Motions to exclude Pottinger's expert testimony at Dockets 161 and 174 are **GRANTED in part** and **DENIED in part**; and

(3) Defendants' Motions to exclude Coburn's expert testimony at Dockets 159 and 177 are **GRANTED in part** and **DENIED in part**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 4th day of December 2020.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE