IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOLYN L. SPECTER, as Personal Representative of the ESTATE OF JAMES E. SPECTER, M.D., and on behalf of herself, and the Surviving Family Members including KEVIN SPECTER, and DAVID W. WOOD, JR. and MARIANNE WOOD, Individually an on behalf of the marital community,<br><br>                            Plaintiffs,<br><br>                            v.<br><br>TEXAS TURBINE CONVERSIONS, INC., a Texas Corporation, RECON AIR CORPORATION, a foreign corporation,<br><br>                            Defendants. | Case No. 3:17-cv-00194-TMB<br><br>ORDER ON DEFENDANTS' MOTION IN LIMINE TO EXCLUDE AIRWORTHINESS DIRECTIVES (DKT. 163) |

## I.    INTRODUCTION

The matter comes before the Court on Recon Air Corporation's ("RAC") Motion in Limine (the "Motion"), in which Texas Turbine Conversions, Inc.'s ("TTC") joins, to preclude Plaintiffs' experts from testifying about (1) specific airworthiness directives ("ADs") issued by the Federal Aviation Administration ("FAA") and its Canadian Counterpart, Transport Canada; and (2) Flight Manual Supplement ("FMS") #4 issued by Stolarius.[1] Plaintiffs oppose the Motion, and the matter is full briefed by the Parties.[2] The Parties have not requested oral argument, and the Court

---

[1] Dkts. 163 (Motion); 163-1 (Memorandum in Support of Motion); 230 (TTC Motion for Joinder). RAC and TCC are the remaining Defendants in this action and are referred to collectively as "Defendants."

[2] Dkts. 226 (Plaintiffs' Opposition); 261 (RAC's Reply)

1

concludes oral argument is not necessary. Based on the following reasons, the Motion is **GRANTED**.

## II. BACKGROUND

The background facts of this case are set out in detail in this Court's order at Docket 313. The facts are incorporated by reference and will not be repeated here.[3]

On July 12, 2020, RAC filed the instant Motion, arguing that Plaintiffs' expert witnesses should be prohibited from testifying about AD CF-2016-05 (and its subsequent revision), AD FAA 2016-10-03, and FMS #4 (collectively referred to as "Directives").[4] RAC argues that the Court should exclude testimony about these ADs because: (1) the directives were previously deemed unreliable in a similar matter involving overlapping parties and issues ("Soldotna Litigation"); (2) the directives are applicable to land, not float, planes and are therefore irrelevant; (3) RAC could not have considered the alleged import of the directives because they were issued *after* RAC completed work on the aircraft; (4) RAC correctly and properly confirmed the compatibility of the turbine engine; and (5) the directives were not based on any flight test data or empirical evidence, and any probative value the ADs might have is outweighed by risk of jury confusion.[5]

On August 31, 2020, Plaintiffs filed an Opposition to RAC's Motion ("Opposition") arguing this case is distinguishable from the Soldotna Litigation because there, RAC "did not dispute that it was required to determine the compatibility of the STOL kit[6] and the Texas Turbine

---

[3] Dkt. 313 (Order on Parties' Motions in Limine re Certain Expert Testimony).

[4] Dkts. 163 at 1–2; 163-1 at 2–3.

[5] Dkt. 163-1 at 4.

[6] A "STOL kit" is a short takeoff and landing kit, a modification installed on the subject aircraft in 2014. *See* Dkt. 1 at ¶ 4 (Complaint); *see also* Dkts. 25 at ¶ 4 (TTC Answer); 28 at ¶ 4 (RAC Answer, Third Party Complaint, and Crossclaim).

conversion during installation" and "RAC has made no such admission in this case."[7] Plaintiffs further contend that although the ADs would normally be subject to limitations or exclusions, because Defendants intended to assert as a defense that Rainbow King Lodge ("Rainbow King") and its employees misloaded the aircraft, when Plaintiffs examine Defendants and defense witnesses on this misloading defense and ask what effect the STOL kit has on the controllability of the aircraft, the ADs will become relevant.[8]

RAC then filed its Reply pointing out that RAC "has acknowledged that it did, in fact, have the duty to confirm the compatibility of the turbine engine and the Baron STOL kit, and did so by reference to approved technical data and the relevant installation instructions[.]."[9] Moreover, RAC argues that whether or not RAC has admitted that it had an obligation to determine the compatibility of installed components has no bearing on the conclusions of the Court in the Soldotna Litigation—namely, that the ADs and FMS #4 are unreliable and risk confusing the jury.[10]

### III. LEGAL STANDARD

Federal Rule of Evidence ("FRE") 401 "defines relevant evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[11] "If evidence is relevant,

---

[7] Dkt. 226 at 3 (internal quotation marks omitted).

[8] *Id.* at 5.

[9] Dkt. 261 at 4.

[10] *Id.* at 2, 4–5, 8–10.

[11] *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 953 (9th Cir. 2011) (quoting *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc)).

3

it is generally admissible under [FRE] 402."[12] "However, relevant evidence must be excluded [under FRE 403] if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[13]

## IV. DISCUSSION

*A. FAA Certification and Airworthiness Directives Generally*

In *GATX/Airlog Co. v. United States*, the Ninth Circuit summarized the process by which the FAA develops Supplemental Type Certificates ("STC") and ADs:

> [T]he FAA has prescribed a comprehensive set of rules and regulations, including a multi-step certification process, for aircraft design and production . . . . Three aspects of the design certification process are relevant here: the type certificate, supplemental type certificate, and airworthiness directive. The first stage of this process is type certification, in which airplane manufacturers seek approval of new aircraft designs. Under federal regulations, aircraft manufacturers must analyze and test their new aircraft designs. Based on the resulting engineering and test data, the FAA then determines the airworthiness of those designs. If the manufacturer demonstrates that the design complies with federal regulations, the FAA issues a type certificate. In most instances, the type certificate covers an aircraft model, rather than an individual airplane. Any major change to an FAA-approved design then requires additional certification in the form of a supplemental type certificate, also known as an STC. By issuing an STC, the FAA approves a modification to a previously-certified aircraft design. STCs are obtained through the same process as type certificates: the applicant must provide the FAA with sufficient engineering and test data to demonstrate compliance with federal regulations.
>
> After issuing a type certificate or STC, the FAA continues to monitor the safety of the certified aircraft. The FAA may amend, modify, suspend or revoke a certificate for airworthiness reasons. Such an order takes the form of an airworthiness directive and may require the aircraft owner to alter the aircraft to maintain its certification. After the FAA issues an airworthiness directive, the particular aircraft may only be operated in compliance with that directive. More specifically, "[t]he FAA issues an airworthiness directive addressing a product when [it] find[s] that: (a) An unsafe condition exists in the product; and (b) The condition is likely to exist or develop in other products of the same type design."

---

[12] *Id.*

[13] *Id.* (citing Fed. R. Evid. 403) (emphasis added).

14 C.F.R. § 39.5. The process followed by Transport Canada to issue STCs and ADs is presumed to be similar.[14]

B.     *Airworthiness Directives and Flight Manual Supplement #4*

RAC seeks to preclude Plaintiffs' expert witnesses from testifying about AD CF-2016-05, and its subsequent revision, AD FAA 2016-10-03, and FMS #4.[15]

After an accident in March 2014 involving a landplane of the same model as the present aircraft, the FAA sent two safety recommendations ("SRs") to Transport Canada:

> 13.239 - The Baron STOL Kit Flight Manual Supplement states there is no change in weight and balance with regard to the aft center of gravity. Transport Canada states the center of gravity as tested was 138.1 - 148, this does not correspond to the original certificated [C.] G. range with DeHavilland Mod 3/746 installed for a landplane, aft limit 152.2. A determination should be made as to what the correct aft center of gravity should be with a Baron STOL kit installed on a landplane, ski plane and float plane.
>
> 13.240 - The flight stall characteristics should be observed with the Baron STOL kit to see if the kit meets the requirements of what DeHavilland was trying to prevent with the inboard stall strips, adverse stall characteristics with an aft center of gravity.[16]

Transport Canada investigated the SRs; however, by February 2015, Transport Canada still had no flight test data supporting the published center of gravity ("CG") limits and confusion remained

---

[14] 286 F.3d 1168, 1171 (9th Cir. 2002) (citation omitted); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 806 (1984) (Before an aircraft may be placed into service, "its owner must obtain from the FAA an airworthiness certificate, which denotes that the particular aircraft in question conforms to the type certificate and is in condition for safe operation." It is unlawful for any person to operate an aircraft in air commerce without a valid airworthiness certificate. An additional certificate is required when an aircraft is altered by the introduction of a major change in its type design. To obtain this supplemental type certificate, the applicant must show the FAA that the altered aircraft meets all applicable airworthiness requirements.).

[15] Dkts. 163 at 1–2; 163-1 at 2–3.

[16] *In re Crash of Aircraft N93PC on July 7, 2013, at Soldotna, Alaska*, 455 F. Supp. 3d 906, 909 (D. Alaska 2020) (hereinafter "*Aircraft N93PC*") (citations to the record omitted).

5

"as to which published CG limit is applicable to the Baseline Aircraft equipped with the Baron STOL Kit."[17] Transport Canada stated that the STC holder, Stolairus Aviation "was not able to provide substantiating data to support the unchanged aft CG limit, nor did it carry out flight tests to establish a new aft CG limits."[18] On May 28, 2015, "the STC holder issued revision #3 to Stolairus [] [FMS] #4 to revise the aft CG limits to 148.3 inches, regardless of aircraft confirmation (wheels, skis and or floats)."[19]

In January 2016, Transport Canada issued Canadian Airworthiness Directive CF-2016-05 mandating the use of the revised CG limits in revision #3 of the Stolairus FMS.[20] The background section of AD CF-2016-05 read:

> The investigation of a fatal crash of a turbo-propeller powered DHC-3 aeroplane modified with a Baron STOL kit determined the probable cause as a rearward shift in the centre of gravity resulting in a stall during take-off. This AD is issued to mandate revised centre of gravity limits in order to assure adequate stall margins in all phases of flight. A centre of gravity that is too far aft can contribute to a stall during takeoff and may result in loss of control of the aeroplane in other phases of flight.[21]

The Stolairus Flight Manual Supplement (FMS #4) was subsequently revised to show that the aft CG limit was 148.3 inches.[22] In response to Transport Canada's AD CF-2016-05, on May 27,

---

[17] *Id.* at 910 (internal quotation marks, alterations, and citations omitted); Dkt. 163-8 (Email Exchange).

[18] *Id.* (internal quotation marks, alterations, and citations omitted).

[19] Dkt. 163-8 at 2 (FAA Recommendations Letter); *Aircraft N93PC*, 455 F. Supp. 3d at 910.

[20] *Aircraft N93PC*, 455 F. Supp. 3d at 910 (internal citations omitted); Dkt. 163-10 (AD CF-2016-05) (Effective Date: February 8, 2016).

[21] Dkt. 163-10.

[22] *Aircraft N93PC*, 455 F. Supp. 3d at 911 (internal quotation marks, alterations, and citations omitted).

2016, the FAA issued AD FAA 2016-10-03 "to correct the center of gravity and prevent such a stall during takeoff and loss of control during other phases of flight."[23]

In March 2017, a Transport Canada employee noted:

> According to the NTSB final report for the July, 2013 DHC-3 Crash in Soldotna AK that was the impetus for our CF-2016-05 and FAA AD 20[1]6-10-03[,] the accident occurred with the airplane weight exceeding the maximum gross weight of 8,000 lbs by about 21 lbs and the CG at least 5.5 inches aft of the 152.2-inch limit that was in place at the time. It was also noted that the takeoff occurred with full flaps, which exacerbated the situation. A flight test program that expands the CG envelope from 148.8 aft to 152.2 would therefore not appear to present an excessive amount of risk. From what I understand everyone operated with aft CG limits at max weight at 152.2 for 20 years with no issues.[24]

In June 2017, Transport Canada issued a revision, AD CF-2016-05R1, which altered the background section to read: "The [NTSB] investigation of a fatal crash of a turbo-propeller powered DHC-3 aeroplane modified with a Baron STOL kit determined the probable cause of the accident as: 'operation of the airplane outside of the weight and center of gravity limits contained in the airplane flight manual, which resulted in an aerodynamic stall.'"[25]

On September 22, 2018, flight testing was conducted on a DHC-3 Otter with a TTC conversion and a Baron STOL kit "with the center of gravity varying progressively aft from approximately 146 inches to the former aft limit of 152.2 aft of datum."[26] The flight test results were "unremarkable" and established the DHC-3 aircraft with full flap setting, and as modified

---

[23] *Id.*

[24] Dkt. 163-13 (Email Exchange Between Transport Canada Officials); *Aircraft N93PC*, 455 F. Supp. 3d at 911. Another Transport Canada representative, in response, stated "I agree with you that the 152.2 aft CG limit is probably safe." Dkt. 163-13 at 3–4.

[25] Dkt. 163-14 (AD CF-2016-05R1); *Aircraft N93PC*, 455 F. Supp. 3d at 911–12.

[26] Dkt. 163-15 (Stolarius Flight Manual Supplement).

7

with the TTC conversion and a Baron STOL Kit, was controllable with an aft CG of 152.2, as stated in the prior Stolairus FMS.[27]

### C. Parties' Arguments

Here, the subject aircraft was modified by RAC in 2014, and the modifications included an engine conversion and installation of a STOL Kit.[28] RAC now moves to exclude Plaintiffs' experts from testifying about or introducing the ADs because:

> (1) the ADs have previously been deemed unreliable and inadmissible by Judge H. Russel Holland in a substantially similar matter [("Soldotna Litigation")]; (2) the ADs are irrelevant, as they implicate revisions only to wheeled/land aircraft, and the aircraft at issue in this lawsuit is a float plane; (3) RAC could not have considered the alleged import of those A[D]s since they were issued after RAC had completed its work on this aircraft[;] (4) RAC correctly and properly confirmed the compatibility of the turbine engine and the Baron STOL kit by reference to the approved technical data and installation instructions[;] (5) the ADs in question were not issued based on actual flight test data or any other empirical evidence, but rather because the relevant government authorities simply could not locate the original flight test data which must have been supplied to Transport Canada back when it originally approved both the STC and Flight Manual Supplement ("FMS") for the Baron STOL kit[;] and (6) any probative value associated with the ADs is outweighed by the risk of jury confusion and undue prejudice to RAC.[29]

Specifically, RAC takes issue with the following testimony from Plaintiffs' expert Pottinger:

> The flight manual supplement for the [Texas Turbines] conversion contained the caution regarding rudder authority approaching stall. [RAC] knew or should have known it was installing a STOL kit that would further lower stall speeds, increasing the difference between the stall speed and the loss of rudder authority uncovered by [TTC] in its flight testing. There is no evidence [RAC] undertook any inquiry or testing as to how the [TTC] conversion and the STOL kit would work together or the impact the STOL kit would have on the loss of rudder authority in high angle of attack conditions.
>
> . . .

---

[27] Dkt. 163-15; *Aircraft N93PC*, 455 F. Supp. 3d at 912.

[28] Dkt. 226 at 4; *see also* Dkts. 1 at ¶ 4; 25 at ¶ 4; 28 at ¶ 4.

[29] Dkt. 163-1 at 4.

> Had [RAC] made an inquiry, it would have learned that under certain conditions rudder authority was being lost prior to stall; and, that the STOL kit would have increased the airspeed difference between stall and loss of rudder authority in power on, high angle of attack flight conditions
>
> . . .
>
> Had it gained full knowledge of the situation, Recon Air would at least have provided additional warnings or would have put the STC holders on notice to make additional inquiry for the benefit of owners of aircraft with layered STCs.[30]

RAC also points out Plaintiffs' experts John Cochran and Todd Coburn reference the ADs, and Cochran's report concludes that TTC failed "'to instruct pilots of N928RK through the Aircraft Flight Manual Supplement TTC-FMS-1, Revision D, and by other appropriate means, regarding the changes in the flight characteristics and handling qualities of N928RK due to the Honeywell engine'" and failed to warn "'that the changes in the stability and control characteristics of N928RK due to the Honeywell engine . . . could result in unpredictable handling qualities of the aircraft,'" and that Coburn opines that the issuance of FAA AD 2011-12-02 and Transport Canada AD CF-2016-05 "'reveal that the Texas Turbines/Stolairus Conversions to the DHC-3 Otter resulted in some unsafe flight performance characteristics,'" which, in turn, show that TTC "'did not sufficiently understand how their modifications impacted performance . . . [and] that their certification analysis and flight tests were insufficient.'"[31]

---

[30] Dkt. 163-1 at 2–3 (quoting Dkt. 163-7 at 38, 40 (Pottinger Report)). The Court previously excluded Pottinger's testimony on this point. Dkt. 313 at 15–21 ("Pottinger is qualified as to his opinions that relate to analyzing the crash and its cause, but not as to other topics such as the legal, regulatory, or testing obligations of TTC or RAC, or any duty to warn imposed upon TTC or RAC.").

[31] *Id.* at 2 n.3 (quoting Dkts. 163-5 at 22–25 (Cochran Report); 163-6 at 4 (Coburn Report)).

Plaintiffs concede that under normal circumstances an AD issued after a crash may be reasonably excluded.[32] However, Plaintiffs respond that the present case is distinguishable from the Soldotna Litigation because, unlike in the Soldotna Litigation, RAC has not admitted that it is required to determine the compatibility of the STOL kit and the TTC conversion during installation.[33] Further, Defendants intend to argue, by way of defense, that Rainbow King misloaded the aircraft, by both overloading it and loading it too far aft, rendering it uncontrollable."[34] When Plaintiffs examine TTC and Rainbow King on this defense and ask what effect the STOL kit has on the controllability of the aircraft, depending upon the response, Plaintiffs contend that the ADs will become relevant.[35] Accordingly, Plaintiffs ask that the Court suspend ruling on RAC's Motion and revisit the issue at trial.[36]

RAC does not dispute that it was required to determine the compatibility of the STOL Kit and the TTC conversion during installation and did so by reference to approved technical data and the relevant installation instructions, and RAC argues that whether or not it admitted "that it had the obligation to determine the compatibility of installed components has absolutely no bearing on the concerns articulated by Judge Holland, as the primary facts upon which he based his Order are also present in this litigation."[37] The Court agrees.

---

[32] Dkt. 226 at 5.

[33] *Id.* at 3.

[34] *Id.* at 5.

[35] *Id.*

[36] *Id.*

[37] Dkt. 261 at 4.

D. *The Airworthiness Directives and Flight Manual Supplement are Unreliable and Inadmissible*

First, as the court in the Soldotna Litigation previously concluded, the FAA ADs and FMS revisions to the aft CG limits to 148.3 inches are hearsay and are not public records and reports, and, therefore, the exception to hearsay rule did not apply.[38]

"Hearsay" means an out-of-court statement that a party offers in evidence to prove the truth of the matter asserted in the statement.[39] Hearsay is not admissible unless an exception applies.[40] Under the public records exception to the hearsay rule, "[t]he following [is] not excluded" as hearsay:

> A record or statement of a public office if:
>
> (A) it sets out:
>
> > (i) the office's activities;
> >
> > (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> >
> > (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.[41]

---

[38] *Aircraft N93PC*, 455 F. Supp. 3d at 914–15.

[39] Fed. R. Evid. 801.

[40] Fed. R. Evid. 802.

[41] Fed. R. Evid. 803(8).

"Public records and reports falling under Rule 803(8)[ ] are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence.'"[42] Some courts have admitted ADs under Rule 803(8),[43] while courts have excluded ADs due to a lack of trustworthiness.[44]

Here, as the court in in *Aircraft N93PC* concluded, the evidence shows that Transport Canada issued its AD because Stolairus would not, or could not, provide any flight testing to substantiate an aft center of gravity limit of 152.2 inches, and that it did so without doing any of its own flight testing.[45] Transport Canada made the decision to issue an AD restricting the aft CG limit to the most forward position because it could not get any substantiating data from Stolairus, and the FAA in turn issued its AD based on the Canadian AD.[46] "[T]he evidence shows that the ADs and FMS #4 were not the products of a complete and thorough investigation, which make

---

[42] *Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) (quoting *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)); *but see Brown v. Sierra Nevada Mem. Miners Hosp.*, 849 F.2d 1186, 1189–90 (9th Cir. 1988) ("[The trustworthy] assumption has substantially diminished force when extended to the sources outside the investigative agency from which the agency culls the information for its report.").

[43] *Aircraft N93PC*, 455 F. Supp. 3d at 914 (citing *Melville v. Amer. Home Assur. Co.*, 584 F.2d 1306, 1316 (3rd Cir. 1978) (ADs admissible because "they pertain to *classes* of planes which are similar to the one which crashed in this case").

[44] *Id.* (citing *In re Air Crash Near Roselawn, Indiana*, Case No. 5 C 4593, 1997 WL 572896, at *1 (N.D. Ill. Sept. 10, 1997) (excluding "all post-accident government actions in this case, including the FAA Airworthiness Directives and Flight Safety Information Bulletins and the NTSB Safety Recommendations" because these reports "lack trustworthiness because each government agency involved in the post-accident investigation was subject to different agendas and fact-finding methodology which could undermine and confuse the jury's distinct function in this case").

[45] *Id.* at 915.

[46] *Id*.

their trustworthiness questionable."[47] Furthermore, in light of the 2018 flight testing that was done showing that an aft center of gravity limit of 152.2 inches was safe, the ADs and subsequent revision to FMS #4 can hardly be considered trustworthy.[48] This Court agrees. Because the Directives lack trustworthiness, they are not admissible under Rule 803(8).[49]

Accordingly, insofar as Plaintiffs' experts seek to introduce and discuss the Directives to prove Defendants breached their duty to Plaintiffs or the testimony is otherwise introduced to prove the truth of the matter asserted, the Court concludes the ADs and FMS #4 are hearsay, that the public records exception does not apply, and, as a result, are excluded.

> D. *The Airworthiness Directives and Flight Manual Supplement Are Overly Prejudicial and Risk Confusing the Fact Finder.*

Even if Plaintiffs intend to offer the ADs and FMS #4 solely for rebuttal purposes to the defense that Rainbow King overloaded the aircraft,[50] they are still inadmissible under FRE 403.[51] The Court fails to see how directives, that postdate the manufacturing and installation of the modification of the subject aircraft and are the result of questionable processes, are probative. Additionally, any probative value of these Directives would be outweighed by the inherent risk that the jury would put undue weight on the ADs and FMS #4 because they were issued by

---

[47] *Id.*

[48] *Id.*

[49] *See Brown*, 849 F.2d at 1189–90.

[50] Dkt. 226 at 5.

[51] *See Aircraft N93PC*, 455 F. Supp. 3d at 915 ("[E]ven if the ADs and FMS #4 were not inadmiss[i]ble hearsay, which they are, they would still be subject to exclusion as they are overly prejudicial and would be misleading to the finder of fact.").

government agencies.[52] Further, "because while neither agency was tasked with investigating the accident and neither determined a probable cause of the accident, the ADs imply that the agencies determined a cause of the accident" there is a substantial risk introduction of these directives could mislead fact finders.[53]

Plaintiffs' argument that the Court reserve judgment because RAC has not admitted it has a duty to ensure compatibility and on the off chance the ADs and FMS #4 are needed to rebut defense witness testimony is unavailing. First, RAC admits it has a duty to ensure compatibility. Second, whether Defendants argue about the weight or overloading impact on the aircraft's controllability does not justify introducing inapplicable and unreliable directives not in existence at the time of the turbine conversion and STOL kit manufacturing and installation.

Accordingly, for the foregoing reasons, the RAC's Motion at Docket 163 is **GRANTED** and Plaintiffs' experts are precluded from testifying about or relying on these Directives.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 11th day of December 2020.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[52] *See id.* (citing *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1357–58 (4th Cir. 1995) (affirming district court's exclusion of state agency report because of likelihood jury would place undue weight on it)).

[53] *Id.* RAC also argues that "[n]ot only could a jury be misled into believing that the agencies investigated the incident and determined a cause of the accident, but the risk of unfair prejudice is further augmented by the fact that the ADs in question do not even apply to the subject aircraft. The ADs apply to wheeled planes, and the subject aircraft in this litigation is a float plane -- and FMS #4 did not revise the portion regarding a float plane; that portion remained exactly the same as the previous FMS." Dkts. 261 at 5; 163-1 at 3–4, 13. The directives and revisions do not specify applicability to floatplanes or limit application to wheeled or landplanes. *See* Dkts. 163-10;163-14; *but see* Dkt. 163-8 at 2. However, because the Court concludes the directives are untrustworthy and the risk of prejudice outweighs any probative value, the Court need not address this argument in reaching its conclusions.