IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOLYN L. SPECTER, as Personal Representative of the ESTATE OF JAMES E. SPECTER, M.D., and on behalf of herself, and the Surviving Family Members including KEVIN SPECTER, and DAVID W. WOOD, JR. and MARIANNE WOOD, Individually an on behalf of the marital community,<br><br>                      Plaintiffs,<br>v.<br><br>TEXAS TURBINE CONVERSIONS, INC., a Texas Corporation, RECON AIR CORPORATION, a foreign corporation,<br><br>                      Defendants. | Case No. 3:17-cv-00194-TMB<br><br><br>ORDER ON DEFENDANT TEXAS TURBINE CONVERSIONS, INC.'S MOTIONS FOR SUMMARY JUDGMENT FOR INADEQUATE INSTRUCTION (DKT. 172) AND FAILURE TO WARN (DKT. 173) |

## I.    INTRODUCTION

The matters come before the Court on Texas Turbine Conversions, Inc.'s ("TTC") Motions for Summary Judgment for Inadequate Instruction and Failure to Warn (individually, the "Motion," or, together, "Motions").[1]  Defendant Recon Air Corporation ("RAC," and, together with TTC, "Defendants") joins the Motions.[2]  Plaintiffs oppose the Motions.[3]  The matters are fully briefed and ready for consideration by the Court.[4]  Oral argument was not requested on the

---

[1] Dkts. 172 (Motion re: Inadequate Instruction); 173 (Motion re: Failure to Warn).

[2] Dkts. 183 (RAC Joinder to Dkt. 172); 184 (RAC Joinder to Dkt. 173).  Given that RAC has joined both Motions, this order refers to arguments in the Motions as "Defendants'" arguments.

[3] Dkts. 218 (Plaintiffs' Opposition to Dkt. 172); 224 (Plaintiffs' Opposition to Dkt. 173).

[4] Dkts. 172; 173; 183; 184; 218; 224; 269 (TTC Reply re: Inadequate Instruction); 270 (TTC Reply re: Failure to Warn).

1

Motions and the Court finds the matters suitable for disposition without oral argument. For the following reasons, the Motion at Docket 172 is **GRANTED** and the Motion at Docket 173 is **GRANTED in part** and **DENIED in part**.

## II.    BACKGROUND

The background facts of this case are set out in detail in this Court's order at Docket 313. The facts are incorporated by reference and will not be repeated here.[5] Due to a lengthy discovery process and by agreement of the parties, TTC filed its Motions for Summary Judgment for Inadequate Instruction and Failure to Warn on July 15, 2020.[6] Plaintiffs filed their Oppositions to the Motions on August 31, 2020.[7] TTC filed its Replies on September 22, 2020.[8]

### A.  *Motion for Summary Judgment for Inadequate Instruction*

Defendants argue that summary judgment should be granted on the question of whether Defendants provided adequate instruction for safe operation of the aircraft.[9] Defendants believe Plaintiffs are alleging that Defendants had a duty to train or a duty to instruct pilots on the plane, beyond what was listed in the Approved Flight Manual Supplement (the "AFMS").[10] Their

---

[5] *See* Dkt. 313 (Order on Defendants' Motions in Limine re: Certain Expert Testimony). Plaintiffs filed a stipulated Amended Complaint on January 22, 2021 to remove claims based on their abandoned center of gravity theory and update the Complaint to include claims based on the subject plane's "tendency to roll to the right and yaw." The claims litigated on summary judgment remain unchanged. *See* Dkts. 335 (Stipulation Regarding Amended Complaint); 338 at ¶¶ 36, 56 (Amended Complaint).

[6] Dkts. 172; 173.

[7] Dkts. 218; 224.

[8] Dkts. 269; 270.

[9] Dkt. 172 at 1, 23.

[10] *Id.* at 13 ("Plaintiffs confuse the specific duty of a manufacturer to provide adequate warnings with a general obligation to ensure a pilot's proficiency.").

2

impression is based on Plaintiffs' Complaint and subsequent Amended Complaint, which both allege that Defendants are negligent because of a "[f]ailure to provide adequate instructions for the safe use of the aircraft" and liable for strict liability because there was a "lack of warnings and instruction," which were "substantial factors in causing the crash."[11] First, Defendants ask the Court to adopt the reasoning of the Minnesota Court of Appeals, affirmed by the Minnesota Supreme Court, that the duty to warn does not encompass a duty to "train the end user[.]"[12] Second, Defendants assert, and Plaintiffs do not dispute, that Pilot John Furnia ("Pilot Furnia") was instructed on the engine's operations by Bobby Bishop, of TTC, and Virgil Peachy, a pilot who accompanied Pilot Furnia from Ontario, Canada to Wasilla, Alaska.[13] This instruction was a courtesy for customers "to make sure they knew how to start the turbine engine."[14] Third, Defendants argue that Pilot Furnia read and understood the AFMS, which included a "comprehensive set of instructions for the safe operation of the aircraft."[15] Thus, even if there was a duty, that duty was discharged by TTC's courtesy instruction and/or the AFMS.[16]

In Response, Plaintiffs assert that the Motion is based on a "straw man of a liability theory" and "on a theory not in the case."[17] Plaintiffs cite their experts' opinions regarding the AFMS and

---

[11] Dkts. 1 at ¶¶ 55(b), 67 (Complaint); 338 at ¶¶ 54(i), 66 (Amended Complaint); *see also* Dkt. 172 at 3.

[12] Dkt. 172 at 13; *see Glorvigen v. Cirrus Design Corp.*, 796 N.W.2d 541, 552 (Minn. Ct. App. 2011) *affirmed in Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 582–83 (Minn. 2012).

[13] Dkt. 172 at 7, 15.

[14] *Id.* at 17.

[15] *Id.* at 22.

[16] *Id.* at 23.

[17] Dkt. 218 at 2–3.

warnings contained (or not contained) therein, specifically the conclusions that TTC did not adequately describe or warn pilots regarding the use of takeoff settings or other changed flight characteristics, and that the "instruction" in the AFMS was deficient.[18] They argue that the Motion should be denied for three reasons, even if it addressed Plaintiffs' "actual claims."[19] First, they argue that the adequacy of a warning is a question of fact for the jury.[20] Second, they argue that any failure to properly weigh and balance the aircraft is "irrelevant under Alaska law" because it is relevant to Defendants' defense—such as comparative negligence—as opposed to whether liability should be found in the first place.[21] And third, they argue that even under the Minnesota authority cited by Defendants, an important predicate is whether the written warnings were adequate, which, here, they were not.[22]

Defendants in reply argue that Plaintiffs contest the sufficiency of the warnings and/or instructions, but the threshold question of the existence of a duty is a question of law appropriate for summary judgment.[23] They again argue that "there is no general duty for an aircraft component manufacturer like TTC to teach licensed pilots . . . how to fly an airplane or recover from a stall."[24] They further argue that Pilot Furnia's piloting knowledge and experience goes to the issue of causation, which is a required element for both strict liability and negligence claims under Alaska

---

[18] *Id.* at 3–4.

[19] *Id.* at 5.

[20] *Id.*

[21] *Id.* at 5–6.

[22] *Id.* at 6–7.

[23] Dkt. 269 at 7.

[24] *Id.*

4

law.[25]  Defendants also raise arguments against Plaintiffs' theory of liability that relates to the plane's "roll and yaw."[26]

B. *Motion for Summary Judgment for Failure to Warn*

Plaintiffs allege that the plane had a tendency to roll to the right and yaw as a result of the TTC engine conversion and that this rightward roll and yaw was a substantial factor in the crash.[27] They also allege that Defendants failed to warn of this right roll and yaw, and that the lack of warning was a substantial factor in the crash.[28]  Defendants disagree, and move for summary judgment on Plaintiffs' failure to warn claims.[29]  First, Defendants argue that Pilot Furnia had an obligation to review and understand the contents of the AFMS, which was approved by the FAA, and that Pilot Furnia satisfied that obligation.[30]  Defendants argue that compliance with regulatory rules, while not dispositive, weighs in their favor.[31]  Defendants add that Pilot Furnia knew it was important to fly the plane within the operational parameters established in the AFMS, including its weight and balance limits, and that the plane could become unstable and dangerous if flown outside of those limits (as was the case here).[32]  Second, Defendants argue that there is no duty to

---

[25] *Id.* at 9.

[26] *Id.* at 9–13.  Defendants argue, in part, that Pottinger's opinion is based on speculation.  *Id.* at 10 ("Mr. Pottinger presumes to read Mr. Furnia's mind, even when his clairvoyant speculations directly contradict Mr. Furnia's statements and testimony and the findings of the NTSB.").

[27] *See* Dkt. 338 at ¶ 35, 55-56, 61, 70.

[28] *See* Dkt. 327-1 at ¶ 67.

[29] *See* Dkt. 173.

[30] *Id.* at 14–19.

[31] *Id.* at 18.

[32] *See id.* at 15–19.

warn of open and obvious danger, including the risks associated with flying the plane "outside the established limits" for weight and center of gravity.[33] Simply put, Defendants argue it was obvious that flying an overweight plane with a center of gravity too far aft could result in unstable flying conditions.[34] Third, they argue that the original Airplane Flight Manual (the "AFM") and AFMS contained sufficient warnings as to center of gravity, performance characteristics, and stall characteristics.[35] The AFM and AFMS warned that the propeller factor ("p-factor")[36] changed as a result of the engine conversion and that the stall speeds changed (were slower).[37] Defendants also state that the AFM and AFMS warned of the possible loss of rudder authority with "power on and flaps extended."[38] Defendants contest any assertion by Plaintiffs or Plaintiffs' experts that the plane stalled at any point prior to the crash.[39]

In Response, Plaintiffs take a very different view. First, they argue that the engine was defective due to a tendency to right turn, roll and yaw, and that the warnings contained in the AFM and AFMS were insufficient.[40] They primarily rely on their expert Mark Pottinger ("Pottinger"), who opined that the TTC AFMS "did not adequately describe or warn pilots" of changes in aircraft

---

[33] *Id.* at 19–20.

[34] *Id.*

[35] *Id.* at 20–24.

[36] "The p-factor is a term given to the moment on a propeller at an angle of attack due to the difference in the forces on the blades at different clock positions." Dkt. 224-3 at 17 (Cochran Expert Report).

[37] Dkt. 173 at 22.

[38] *Id.* at 23.

[39] *Id.* at 22–23.

[40] Dkt. 224 at 3–4.

performance, including what to do in the event of a stall or limitations on the use of takeoff flaps.[41]
They argue that this lack of warning was compounded by the fact that TTC tested flaps in the
climb setting instead of the takeoff setting as described in the AFM.[42] A second Plaintiffs' expert,
John Cochran ("Cochran"), opined that TTC failed to warn pilots through the AFMS of changes
in performance characteristics.[43] Cochran opined that the propeller modification caused the plan
to roll and yaw to the right because of "increased airflow over the left wing."[44] Second, they argue
that the danger was not open and obvious because it is not Pilot Furnia's knowledge that is relevant,
but whether an ordinary pilot would find the danger open and obvious.[45] The record is "silent"
on whether an ordinary pilot would find the danger open and obvious.[46] Plaintiffs argue that the
danger was "hidden" by TTC because TTC used climb flap settings during flight tests instead of
takeoff settings.[47] Third, they argue that the sufficiency of the warnings is a question of fact that
should be left for the jury.[48]

In Reply, Defendants call Plaintiffs' allegations "a canard" with "no basis whatsoever in
fact."[49] Defendants argue that the flight testing of the converted DeHavilland DHC-3 Otter

---

[41] *Id.* at 4 (quoting Dkt. 224-2 at 1–5) (Pottinger Expert Report Excerpt)).

[42] *Id.* at 4.

[43] *Id.* at 4 (quoting Dkt. 224-3 at 26).

[44] Dkt. 270 at 14–15 (citing Dkt. 270-7 (Cochran Dep. 54:15-22)).

[45] Dkt. 224 at 7.

[46] *Id.*

[47] *Id.*

[48] *Id.* at 9.

[49] Dkt. 270 at 4.

floatplane showed minimal roll or yaw and "no loss whatsoever of rudder authority."[50] The floatplane test findings are "exactly opposite of what Plaintiffs contend."[51] Further, Defendants argue, Pilot Furnia's deposition testimony is that he did not experience "any controllability or stability problems in all the time he flew N928RK."[52] Finally, Defendants reassert their arguments about the AFM and AFSM and criticism of Plaintiffs' experts' testimony.[53]

### III.    LEGAL STANDARD

*A.    Summary Judgment*

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[54] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[55] Material facts are those which might affect the outcome of the case.[56] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[57] "There is no genuine issue of fact if, on the record taken as a whole, a

---

[50] *Id.* at 5 (emphasis omitted).

[51] *Id.* at 7.

[52] *Id.* (citing Dkt. 173-2 (Furnia Dep.)).

[53] *Id.* at 11–24.

[54] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[55] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[57] *Id.* at 248.

rational trier of fact could not find in favor of the party opposing the motion."[58] A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[59] Thus, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[60]

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[61] Evidence introduced in opposition to a summary judgment motion does not have to be the kind that would be admissible at trial, but may be any type of evidence identified in Fed. R. Civ. P. 56(c).[62] However, "conclusory assertions are wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment."[63] "A party opposing a summary judgment

---

[58] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[59] *Celotex Corp.*, 477 U.S. at 325.

[60] *Anderson*, 477 U.S. at 249.

[61] *Celotex Corp.*, 477 U.S. at 324.

[62] *See, e.g.*, *id.* at 323–24; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

[63] *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990); *see also Hilsinger v. Enerco Grp., Inc.*, No. 3:13-cv-00003-TMB, 2014 WL 12569381, at *2 (D. Alaska Sept. 3, 2014); *Mills v. Wood*, 2015 WL 2100849, at *1 (citing *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005) and *Walker*, 917 F.2d at 387 ("In general, in ruling on a motion for summary judgment, a court may not weigh the evidence or judge the credibility of witnesses . . . . However, this rule does not apply to conclusory statements unsupported by underlying facts.")).

9

motion must produce '*specific* facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."[64]

### B. Negligence Claims

Under Alaska law, in order to establish a prima facie case of ordinary negligence, Plaintiffs must present evidence to satisfy the following elements: (1) duty, (2) breach of duty, (3) causation, and (4) harm.[65]  Each are "separate and distinct elements of a negligence claim, all of which must be proven before a defendant can be held liable for the plaintiff's injuries."[66]

### C. Strict Liability Claims

Under Alaska law, "[a] product may be defective because of a manufacturing defect, a defective design, or a failure to contain adequate warnings."[67]  However, the "overlap between the two categories [of design and manufacturing defects] is unavoidable…[and] rigid delineation of the two categories is neither necessary nor desirable."[68]  A product is defectively designed if:

> (1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.[69]

---

[64] *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (quoting *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979)).

[65] *Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204 (Alaska 1996).

[66] *Id.*

[67] *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1194 (Alaska 1992) (citing *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 878 n.15 (Alaska 1979)).

[68] *Colt Indus. Operating Corp., Quincy Compressor Div. v. Frank W. Murphy Mfr., Inc.*, 822 P.2d 925, 930 (Alaska 1991).

[69] *Beck*, 593 P.2d at 886; *see also Shanks*, 835 P.2d at 1194.

Case 3:17-cv-00194-TMB   Document 339   Filed 01/25/21   Page 10 of 26

In addition, "the plaintiff in a strict products liability suit must establish as part of his cause of action that the product was defective at the time it left the possession of the manufacturer."[70] Products liability only applies to "sellers, manufacturers, wholesale or retail dealers and distributors."[71]

In failure to warn claims, "the focus in a strict liability case is on the condition of the product itself."[72] "The knowledge and acts of the victim are relevant to the defendant's defense," including comparative negligence.[73] The Alaska Supreme Court summarized the duty to warn as follows:

> A product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warning of such danger.[74]

There is "no duty to warn of hazards or dangers that would be readily recognized by the ordinary user of the product."[75] In strict liability actions, however, the alleged warning defect must be a "proximate cause of plaintiff's injuries."[76]

---

[70] *Hiller v. Kawasaki Motors Corp., U.S.A.*, 671 P.2d 369, 372 (Alaska 1983).

[71] *Burnett v. Covell*, 191 P.3d 985, 987–88 (Alaska 2008) (internal quotations and citation omitted).

[72] *Prince v. Parachutes, Inc.*, 685 P.2d 83, 87 (Alaska 1984).

[73] *Id.*

[74] *Id.* at 88 (citing California Jury Instructions § 9.00.7).

[75] *Id.* (citing *Jackson v. Coast Paint and Lacquer Co.*, 499 F.2d 809, 812 (9th Cir. 1974) ("On the issue of the duty to warn, however, the question.. . . .is whether 'the danger, or potentially [sic] of danger, is *generally known and recognized* . . . .") (citation omitted) (emphasis added)).

[76] *Id.* (citing *Beck*, 593 P.2d at 878).

11

## IV. ANALYSIS

The Court will first address RAC's liability for Plaintiffs' strict liability claims. Second, it will address any alleged duty for TTC to teach or train Pilot Furnia. Finally, the Court will address each of the two failure to warn claims, one for an alleged "significant right turn tendency" and one concerning the use of takeoff settings versus climb settings.

### A. RAC's Liability for Strict Liability Claims

Alaska Law permits products liability cases only against "sellers, manufacturers, wholesale or retail dealers and distributors."[77] Parties that are not part of the chain of sale are not liable for strict liability.[78] Count II of Plaintiffs' Amended Complaint asserts strict liability claims against both TTC and RAC.[79] However, RAC asserts in its joinders to TTC's Motions at Dockets 172 and 173 that it is "not a manufacturer, distributor, or retailer of any product and is therefore not in the 'chain of sale' of any product."[80] Indeed, Plaintiffs' responses to the Motions only discuss TTC's alleged liability and Plaintiffs have made no showing that RAC should be held equally liable.[81] The record shows that the engine conversion was purchased by Rainbow King Lodge from TTC, not RAC, and that RAC merely installed the purchased modifications onto the subject

---

[77] *Burnett*, 191 P.3d at 987–88 (internal quotations and citation omitted).

[78] *See Bachner v. Pearson*, 479 P.2d 319, 327–28 (Alaska 1970); *Burnett*, 191 P.3d at 987–88.

[79] Dkt. 338 at ¶¶ 51-56.

[80] Dkts. 183 at 2; 184 at 2.

[81] *See, e.g.*, Dkt. 224 at 5 (TTC"had a duty to warn that was breached."), 3 ("Plaintiffs assert that Texas Turbine failed to properly warn Furnia in two ways[.]"). All of the evidence, including the expert opinion of Cochran and inadmissible opinion of Pottinger, concern *TTC's* alleged duty and failure to warn. *See id.* at 4, 9. The bare allegation against RAC in Plaintiffs' Amended Complaint is unsupported by any argument in the Motions and therefore insufficient. *See Anderson*, 477 U.S. at 256 (nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial).

plane at the direction of TTC.[82] TTC was both the manufacturer and seller of engine conversion, and Plaintiffs point to no evidence that shows RAC "actually sold or otherwise placed the [allegedly] defective product on the market."[83] As such, RAC is not liable for Plaintiffs' strict liability claims, including the failure to instruct and failure to warn strict liability claims at issue here. The Court's finding in no way affects RAC's liability for Plaintiffs' other claims against them. Since RAC is not liable for Plaintiffs' strict liability claims as a matter of law, the Court **GRANTS** summary judgment to RAC on the Motions at Dockets 172 and 173.

### B. Duty to Teach, Train, or Instruct Pilot Furnia

The Court **GRANTS** summary judgment on the Motion at Docket 172 and finds that there is no duty to teach under Alaska law that is separate and apart from TTC's duty to warn. Defendants interpret the Complaint as alleging that Defendants had a duty to teach, such as through hands-on training.[84] In their Response, Plaintiffs all-but-concede that they are *not* making such an allegation but, instead, are challenging the sufficiency of the warnings in the written AFM and

---

[82] Dkt. 173 at 5–6.

[83] 72A C.J.S. Products Liability § 67. "[S]trict liability is not applied to installers because (1) they are not involved in the sale of the product, (2) they did not receive any profit from the placing of the defective product in the stream of commerce, and (3) an installer lacks the purchasing power of a retailer or distributor and therefore cannot exert pressure on the manufacturer to enhance product safety." *Id.*; *see also Burnett*, 191 P.3d at 988 ("We have extended the scope of strict products liability in the past, but have refused to extend strict products liability beyond those who place a product into the stream of commerce."). Furthermore, the record shows that TTC was involved with the inspection and delivery of the subject plane to Rainbow Lodge. *See* Dkt. 173 at 6 ("Bobby Bishop of TTC traveled to Recon's facility . . . and inspected the engine conversion to confirm its correct installation and operation."). Bobby Bishop of TTC instructed Pilot Furnia on the engine operations before the plane was flown to Alaska. Dkt. 172 at 15. Furthermore, the co-pilot who delivered the plane to Alaska along with Pilot Furnia, Virgil Peachy, was a pilot "suggested by TTC[.]" *Id.*

[84] Dkt. 172 at 13.

AFMS.[85]  Plaintiffs do not allege that Defendants were required to provide hands-on training. Since the Complaint and Amended Complaint allege a "lack of warnings and instruction," the Court understands how Defendants may have been under the impression that Plaintiffs view warnings and instruction as distinct theories of liability.[86]  The Plaintiffs' briefing makes clear, however, that they are not distinct theories, and instead are both appropriately analyzed in the failure to warn context.[87]

Failing to instruct Pilot Furnia through hands-on training or classes is not dispositive of any of Plaintiffs' claims.  Indeed, the parties cite no authority from an Alaska court that would impose a specific duty to teach.  The only authority discussed at length by the parties is *Glorvigen v. Cirrus Design Corp.*, a Minnesota case in which the court found that there was no duty to train, either as a standalone duty or an obligation required by the general duty to warn under strict liability law.[88]  Since the Court finds there is no separate duty to teach, the Court need not reach the merits of whether Defendants discharged their duty via instruction by Bobby Bishop or Virgil Peachy, or through the AFM or AFMS.  To the extent the parties make arguments regarding the sufficiency of warnings in the AFM or AFMS, those arguments are more appropriately analyzed

---

[85] Dkt. 218 at 3.

[86] *See* Dkts. 1 at ¶¶ 55(b), 67; 338 at ¶¶ 54(i), 66.  Defendants appear to view "instruct" as synonymous with "teach," while Plaintiffs appear to view "instruct" as synonymous with "written instructions," like in the AFM or AFMS.

[87] *See id.*; *see also* Dkt. 269 at 2 n.1 ("Because a failure to warn and a failure to instruct can be viewed as different issues, TTC filed motions for summary judgment on both the alleged failure to warn and failure to adequately instruct.  To the extent these two concepts are deemed interchangeable by this Court, TTC incorporates its warnings summary judgment motion papers herein.").  The "courtesy instruction" provided by TTC could be probative of whether TTC discharged its duty to warn.

[88] *Glorvigen*, 816 N.W.2d at 583.

14

through TTC's motion at Docket 173 in which TTC moves for summary judgment on Plaintiffs' failure to warn claims.[89]  Accordingly, because there is no duty to teach under Alaska law that is separate and apart from a duty to warn, the Motion at Docket 172 is **GRANTED**.

### C.  Failure to Warn: Right Roll and Yaw

The Court **GRANTS** summary judgment to Defendants on the issue of whether Defendants satisfied any duty to warn about a "dangerous right roll and yaw" of the subject plane under Alaska law.  TTC had a duty to warn of hazards or dangers that are not readily recognized by the ordinary consumer when used in a reasonably foreseeable manner.[90]  Here, no rational trier of fact could reach the conclusion that TTC failed to warn of a dangerous right roll and yaw of the plane, allegedly created by TTC's engine conversion.  Plaintiffs have not carried their burden to show that there is more than a scintilla of evidence and have failed to produce specific facts showing that there remains a genuine factual issue that must be resolved at trial.[91]

Plaintiffs' theory is that the subject plane exhibited a right turn, roll, and yaw, and that, in conjunction with a high angle of attack, the plane entered a sharp right turn and ended up crashing.[92]  Plaintiffs put forward three primary pieces of evidence in support of their claim.  First, they point to the plane's right turn prior to crashing, which is not disputed by the parties.[93]  The right turn was caused, their theory goes, by the "significant right turn tendency" created by the

---

[89] *See* Dkt. 173.

[90] *See Prince*, 685 P.2d at 87–88.

[91] *See Anderson*, 477 U.S. at 251 (quotation and citation omitted); *Steckl*, 703 F.2d at 393.

[92] Dkt. 224 at 3.

[93] *See* Dkts. 173 at 12 ("At the apogee of his initial climb and with Mr. Furnia quite unaware of it, N928RK made a hard turn to the right."); 224 at 3 ("[T]he aircraft entered into a sharp right turn . . . .").

engine conversion.[94]  Second, they discuss the expert opinions of Plaintiffs' experts Pottinger and

Cochran, who opine that TTC did not adequately warn pilots about the right roll and yaw.[95]  This

Court previously found that Pottinger was not qualified to testify as to "any duty to warn imposed

upon TTC or RAC."[96]  Since Pottinger's opinions on this topic are inadmissible, they will not form

the basis of the Court's ruling on summary judgment.[97]  This leaves Cochran's "Opinion 4," which

states that

> Texas Turbine Conversion, Inc. failed to warn pilots of N928RK through the of
> Aircraft Flight Manual Supplement TTC-FMS-1, Revision D, and by other
> appropriate means, that the changes in the stability and control characteristics of
> N928RK due to the Honeywell engine and the Hartzell propeller could result in
> unpredictable handling qualities of the aircraft.[98]

The basis for Cochran's opinion is that the change in p-factor, combined with the increase in the

engine's horsepower, "resulted in changes in magnitudes and reversals in signs of the control

inputs required to control the aircraft."[99]  In simpler terms, the right-pull of the engine caused by

a change in p-factor was exacerbated by the increase in horsepower, which changed the plane's

---

[94] Dkt. 224 at 2.

[95] *Id.* at 2–4.

[96] Dkt. 313 at 19.

[97] *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("While the evidence presented
at the summary judgment stage does not yet need to be in a form that would be admissible at trial,
the proponent must set out facts that it will be able to prove through admissible evidence.") (citing
Fed. R. Civ. P. 56(e)); *Summit Coastal Living, Inc. v. City of Costa Mesa*, No. SACV 18-1369
JVS, 2020 WL 4353677, at *3 (C.D. Cal. May 1, 2020) ("When resolving a motion for summary
judgment, courts may only consider admissible evidence."); Fed. R. Civ. P. 56(c)(2).

[98] Dkt. 224-3 at 26.

[99] *Id.* at 25–26.

flight characteristics. Third, Plaintiffs state that the "right turn, roll and yaw" was described in TTC's flight tests.[100]

Defendants cite a plethora of evidence that directly contradicts Plaintiffs' theory regarding Defendants' failure to warn about the right roll and yaw of the plane. First, they cite a provision of the FAA-approved AFM and AFMS that discusses the change in p-factor. The AFM states "[i]f yaw is prevented with rudder and the nose up tendency with elevator, an uncontrolled pitch will occur *accompanied by a slight right roll (5° to 10°)*."[101] The AFMS, which supplements the AFM, under the heading "Flight Characteristics," states "[t]he flight characteristics are very similar to the original aircraft although the p-factor is opposite to the original due to the counter-clockwise rotation of the engine and propeller."[102] Since the propeller turned counterclockwise on the modified Otter, the p-factor would naturally pull the plane to the right.[103] Defendants' expert Robert Carducci ("Carducci") states that "Pilots are trained to recognize the effects of the [p]-factor and to apply rudder in response to the same as well."[104] Second, Defendants cite the flight testing data of both a converted Otter landplane and Otter floatplane, which they argue contradicts

---

[100] Dkt. 224 at 3.

[101] Dkt. 270-4 at 1–2 (Excerpt of AFM) (emphasis added).

[102] Dkt. 173-13 at 2 (AFMS).

[103] *See* Dkts. 270-3 at 99:22–101:24 (Thomas Bishop Dep.); 224-3 at 17 ("Recall that the aircraft's propeller rotation is counterclockwise (ccw) as viewed by the pilot. As propeller blades move 'downward' on the left-hand side of the xz-plane, they see higher angles of attack (AOA) than the up-going blades on the right-hand side of the xz-plane. Thus, the propeller blades produce more thrust while on the left side of the propeller. This shifts the thrust axis to the left of the centerline of the propeller and produces a positive (nose-right) external yawing moment on the aircraft including the propeller." (excerpt of Cochran Expert Report)). Plaintiffs' expert Cochran notes that the AFMS specifically states that the p-factor is changed. *See* Dkt. 224-3 at 22.

[104] Dkt. 173-11 at 111 (Carducci Expert Report) ("Pilots are trained to recognize the effects of the P-factor and to apply rudder in response to the same as well.").

Plaintiffs' theory.[105]  The flight testing was completed in advance of TTC's application to amend the FAA Supplemental Type Certificate ("STC") that authorized the engine conversion.[106]  The relevant STC in this case was issued May 2001; however, TTC was only authorized to make conversions in Otter landplanes, or wheeled planes.[107]  Additional testing was completed in January 2002, with the explicit goal of testing the turboprop conversion on floatplanes, such that the STC could be amended to permit conversions to both landplanes and floatplanes.[108]  The flight test report states:

> All stalls produced relatively docile behavior . . . Observed roll and yaw angles were 5 degrees, or less. Required rudder travel was not as great during power on stalls as was necessary in the landplane tests. The results of these tests demonstrate acceptable stall characteristics.[109]

Defendants contrast this with the landplane flight test data collected in 2000, as part of the initial STC application process, which states "[s]talls with power on exhibited an increased tendency to roll and yaw to the right."[110]  These flight tests were conducted in concert with the FAA and the FAA approved the STC and its subsequent amendment, such that TTC could convert Otter

---

[105] Dkt. 270 at 5–6.

[106] *See* Dkt. 173-1 at 1–2 ("These test [sic] were conducted in order to verify that the handling characteristics of the TPE-331-10 powered model DHC-3 aircraft are acceptable when the aircraft is operated on floats."); *see also* Dkt. 314 (Order on Motion in Limine to Limit Introduction of Flight Test Data).

[107] Dkts. 176-15 (TTC Flight Test Report (2000)); 176-12 (TTC Flight Test Report (2002)) (stating that "No new type design data is considered under this project; just the issue of compatibility is being investigated so that the 'LANDPLANE ONLY' restriction on the conversion STC can be removed.").

[108] Dkt. 176-12 at 2.

[109] Dkt. 173-12 at 5.

[110] Dkts. 270 at 4–5; 176-15 at 5; 270-1 at 4 (Excerpt of TTC Flight Test Report (2000)).

floatplanes.[111]  Third, Defendants cite the deposition testimony of Pilot Furnia, where Pilot Furnia testified that he read and understood the AFM and AFMS, and never testified that he ran out of rudder due to a right roll and yaw.[112]  In addition, Pilot Furnia testified that the plane was controllable and stable, and that he had flown in the plane for at least 400 hours.[113]

The Court must begin by examining whether there was a hazard or danger about which Defendants had a duty to warn, namely, whether there is any merit to Plaintiffs' claim that the engine conversion created a "significant right turn tendency[.]"[114]  The parties do not dispute that the plane had a natural propensity to pull to the right, due to the change in p-factor associated with the engine conversion.[115]  However, there is a dispute as to the severity of the right pull and whether it, in fact, was a substantial factor in causing the crash.  Even drawing all reasonable inferences in favor of Plaintiffs, their argument that the engine experienced a "significant right turn tendency" that was not warned about, and that the *lack of warning* was a substantial factor in causing the crash, cannot prevail.[116]

---

[111] *See* Dkts. 176-15; 176-12.

[112] *See* Dkts. 270 at 6–8; 173-2 at 88:13-24, 89:5-9, 242:13-15,

[113] Dkt. 173-2 at 241:12-14; 242:9-24 ("[I]t was a good airplane").

[114] Dkt. 224 at 2; *see Prince*, 685 P.2d at 88 (duty to warn of a "substantial danger that would not be readily recognized by the ordinary user of the product") (citation omitted).

[115] *See* Dkts. 270 at 8; 270-3 at 99:22–101:24; 224-3 at 17.  Plaintiffs' expert Cochran notes that the AFMS specifically states that the p-factor is changed.  *See* Dkt. 224-3 at 22.

[116] Whether there was a design defect under Alaska law and whether that alleged defect caused the crash are questions that have not been resolved at the summary judgment stage and will go before a jury.

19

There is scant evidence that the plane had a "significant right turn tendency" that could be characterized as a "hazard or danger[]" that is "not readily recognized" by the ordinary pilot.[117] The main piece of evidence cited by Plaintiffs, other than Opinion 4 of the Cochran Report, is the flight test data. However, the most relevant flight test data supports Defendants' argument. It shows that "[o]bserved roll and yaw angles were 5 degrees, or less" and that the floatplane performed better than the landplane during the stall testing.[118] Plaintiffs argue that the landplane test data from the tests conducted in 2000 supports their argument that there was "an increased tendency to roll and yaw to the right."[119] However, this test report does not concern the converted floatplane and, furthermore, does not indicate the tendency as being dangerous or even "significant."[120] And even if the *landplane's* "tendency to roll and yaw to the right" were dangerous, it could not overcome the compelling evidence from subsequent *floatplane* testing that shows, at most, a minor roll and yaw.

Additionally, Plaintiffs do not allege any inadequacy of the FAA STC approval process or any improper behavior by TTC in complying with the FAA approval process.[121] An STC will only be issued once all "pertinent technical data have been examined and found satisfactory," "all necessary tests and compliance inspections have been completed," and "the alteration has been

---

[117] *See Prince*, 685 P.2d at 87–88.

[118] Dkt. 173-12 at 5.

[119] Dkts. 270 at 4–5; 176-15 at 5; 270-1 at 4 (Excerpt of TTC Flight Test Report (2000)).

[120] *See* Dkt. 270-1 at 4.

[121] *See* Dkt. 321 at 4–5 (Order on Defendants' Motion in Limine to Exclude Airworthiness Directives) (describing FAA STC approval process) (citation omitted).

found to conform with the technical data."[122] While not dispositive, the fact that the engine conversion, and AFMS, was vetted and ultimately approved by the FAA further supports Defendants' position.[123]

Next, Plaintiffs' expert opinion from Cochran is insufficient to defeat summary judgment. It states that TTC "failed to warn pilots . . . that the changes in the stability and control characteristics [of the plane] . . . could result in unpredictable handling qualities of the aircraft."[124] His opinion is based on the change in the p-factor and increase in horsepower.[125] However, the engine's p-factor was explicitly warned about in the AFMS, as discussed below, and the engine's increased power is obvious given that the engine conversion was from a piston engine to a turboprop engine, something that would be known to any pilot of ordinary training who reviewed the AFM and AFMS.[126] Furthermore, Cochran's opinion is vague as to how TTC would properly warn about "unpredictable handling qualities," as it relates to the alleged "tendency to roll and yaw

---

[122] *See* Supplemental Type Certificates, Federal Aviation Administration, https://www.faa.gov/aircraft/air_cert/design_approvals/stc/stc_app/ (last visited Jan. 22, 2021). The Ninth Circuit has described the STC approval process as requiring "expensive and time-consuming design, experimentation and testing." *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 901 (9th Cir. 1992). It is an "arduous process[.]" *Id.* at 899.

[123] *See Sowinski v. Alaska*, 198 P.3d 1134, 1146 n.28 (Alaska 2008) (Generally, compliance with a statute or regulation does not constitute a complete defense to tort liability); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 70-71, 577 P.2d 1322, 1327–28 (Or. 1978) ("Although we have held that compliance with the FAA safety standards does not preclude the possibility of liability . . . it is proper to take into consideration, in determining whether plaintiffs have produced sufficient evidence of defect to go to the jury, the fact that the regulatory agency has approved the very design of which they complain after considering the dangers involved.") *superseded by statute on other grounds*, *see Purdy v. Deere and Co.*, 281 Or. App. 407, 410–11, 386 P.3d 2, 6 (Or. App. 2016).

[124] Dkt. 224-3 at 26.

[125] *Id.* at 25–26.

[126] *See* Dkt. 173-11 at 111.

21

right."[127]  Cochran presents a series of equations and concludes that "increased flow rate through the left side of the propeller . . . and the corresponding reduced flow through the right side of the propeller . . . will result in right-wing-down moment," i.e. a right yaw.[128]  Cochran does not estimate the severity of the right roll or yaw or compare its severity to that of other engines that an ordinary pilot may encounter.[129]  Notably, he does not consider flight test data from the floatplane tests in 2002, which contains data that is directly on point as it relates to the handling qualities of the converted floatplane.[130]  Cochran also does not point to anything in the record to show that there was a demonstrated—as opposed to a theoretical—tendency to roll and yaw to the right.[131] Cochran essentially provides the Court with the uncontroverted opinion that a right roll and yaw was created through the engine conversion.  The Cochran opinion does not point to any "hazard[] or danger[]" that is not "readily recognized" by the ordinary pilot, as it pertains to the alleged right roll and yaw of the plane.[132]  Thus, neither the landplane test data nor the Cochran Report are sufficient to establish a genuine issue of material fact as to a "significant right turn tendency" that TTC had to warn about.

Finally, the Court will consider the warnings themselves.  The Court finds that, even if TTC had an obligation to warn about an alleged "significant right turn tendency," the warnings in the AFM and AFMS were sufficient to satisfy that obligation.  An ordinary pilot would be on

---

[127] *See* Dkts. 224-3 at 23; 224 at 6–7.

[128] Dkt. 224-3 at 17.

[129] *See id.* at 16–17.

[130] *See id.* at 16, 28–29.

[131] *See id.* at 16–17.

[132] *See Prince*, 685 P.2d at 87–88.

notice that the plane could exhibit a right pull as a result of a change in p-factor.[133]  Importantly, the AFMS explicitly states that "the p-factor is opposite to the original due to the counter-clockwise rotation of the engine and propeller."[134]  Any pilot of ordinary training and experience would know that the counterclockwise rotation of the engine and propeller would cause a tendency (in some amount) for the plane to pull to the right.[135]  The Court further agrees that this tendency would be "readily recognized" by any pilot using the plane, since the rotation of the plane's propeller would be obvious as soon as the engine turned on.  The Court is not persuaded by Plaintiffs' argument the "danger" was "hidden."[136]  Plaintiffs' arguments about the "hidden" dangers pertain primarily to the use of climb settings versus takeoff settings, as opposed to the "tendency to roll and yaw right."[137]  Plaintiffs put forward no evidence that refutes Defendants' contention that the alleged right pull was open and obvious.[138]

The record shows that the p-factor changed when the engine was converted, and that the p-factor would typically result in a slight right roll and yaw.  TTC warned pilots of the changed p-

---

[133] *See* Dkt. 173-11 at 111.

[134] Dkt. 173-13 at 2.  The AFMS also contains a warning that says "When demonstrating stalls with power on and flaps extended, full rudder deflection may be reached before aircraft stalls. Recovery must be initiated prior to full rudder deflection."  *Id.*  Pilots are put on notice that the rudder is not a fail-safe if the airplane stalls—"full rudder deflection may be reached."  *See id.*  To the extent the subject plane's rudder may have not been sufficient to counteract the alleged "significant right turn tendency," those limitations were expressly warned about in the AFMS.  *See id.*

[135] This position is corroborated by Defendants' expert Carducci, Plaintiffs' expert Cochran, and the testimony of Thomas Bishop. *See* Dkts. 270 at 8; 270-3 at 99:22–101:24; 224-3 at 17, 22.

[136] *See* Dkt. 224 at 6–7.

[137] *Id.*

[138] *See id.*

factor in the AFMS, and this warning was enough to put pilots of ordinary skill and training on notice of this potential right pull. Since there is no evidence that the alleged "tendency to roll and yaw right" was out of the ordinary, and since the alleged danger was open and obvious, TTC did not need to put any additional warnings in the AFM or AFMS. Accordingly, the Motion at Docket 173 is **GRANTED** as it pertains to TTC's alleged failure to warn about a "dangerous right roll and yaw" of the subject plane.

### D.  Failure to Warn: Takeoff vs. Climb Settings

The Court **DENIES** summary judgment to TTC on the issue of whether TTC satisfied a duty to warn about the use of takeoff settings versus climb settings. TTC had a duty to warn of hazards or dangers that are not readily recognized by the ordinary consumer when used in a reasonably foreseeable manner.[139] Here, Plaintiffs have established a dispute of material fact as to whether TTC provided sufficient warnings as it relates to the use of takeoff settings or climb settings for takeoff.

Plaintiffs' primary piece of evidence is the flight test data of the converted floatplane, which states:

> Three series of stalls were performed; flaps retracted, flaps at "climb", and flaps at "landing" (fully extended). It is noted that a flap position of "takeoff" exists, but when set to that position the flaps are 90% fully extended. Therefore "takeoff" is seldom used for a water takeoff and was not tested. It is most likely that the stall speed and characteristics with flaps at "takeoff" is the same as with flaps at "landing."[140]

---

[139] *See Prince*, 685 P.2d at 87–88.

[140] Dkt. 173-12 at 4.

Case 3:17-cv-00194-TMB   Document 339   Filed 01/25/21   Page 24 of 26

The Engineering Test Card included in the Flight Test Report shows testing was completed only for "flaps up," "climb," and "landing" settings.[141]  Pilot Furnia used takeoff settings on the day of the plane accident.[142]  Plaintiffs argue that "the aircraft will leave the ground faster in [takeoff] settings, thus increasing the risk of the high angle of attack which contributed to this accident."[143]  Plaintiffs' expert Pottinger opined that "[a]s the aircraft climbed, pitch was increased," something that could plausibly have been impacted by the flap settings.[144]  Plaintiffs also point out that the AFM and AFMS do not instruct pilots to use (or not use) climb settings for takeoff, if that is the best practice.[145]

Defendants reply by arguing that Plaintiffs' experts should be discredited.[146]  Indeed, this Court agreed with Defendants in limiting the testimony of Plaintiffs' experts Pottinger and Todd Coburn.[147]  Defendants, however, do not adequately address the dissonance between the flight testing—where takeoff flaps were not tested—and the fact that Pilot Furnia used the *untested setting* on the day of the crash.  Their main assertion is that Plaintiffs' expert Coburn "admitted during his deposition that he had no data to suggest that takeoff flap setting tests would have

---

[141] *Id.* at 14–15.

[142] *See* Dkt. 173-5 at 2 ("[F]laps were in the takeoff position."), 5.

[143] Dkt. 224 at 7.

[144] Dkt. 224-2 at 4.

[145] Dkt. 224 at 9.

[146] Dkt. 270 at 12–13.

[147] *See* Dkt. 313 at 19–29.

revealed anything different about the controllability or stability of the airplane."[148]   Coburn's deposition testimony, however, is not sufficient to overcome Plaintiffs' showing.

Drawing all reasonable inferences in light of Plaintiffs, there is a genuine dispute of material fact as to whether the warnings (or lack of warnings) in the AFM and AFMS were sufficient to put an ordinary pilot on notice of potential risks associated with different flap settings. There is also a genuine dispute of material fact as to whether the alleged lack of warning was a substantial factor in causing the plane crash.  Accordingly, the Motion at Docket 173 is **DENIED** as it pertains to TTC's alleged failure to warn about the proper use of takeoff and/or climb settings of the subject plane.

## V.    CONCLUSION

Accordingly, for the above reasons, the Motion at Docket 172 is **GRANTED** and the Motion at Docket 173 is **GRANTED in part** and **DENIED in part**, as follows:

1. The Motion is **GRANTED** as it pertains to Plaintiffs' failure to warn claims against RAC;

2. The Motion is **GRANTED** as it pertains to Plaintiffs' failure to warn claim against TTC based on the "significant right turn tendency" allegation; and

3. The Motion is **DENIED** as it pertains to Plaintiffs' failure to warn claim against TTC based on the proper use of takeoff settings versus climb settings upon takeoff.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 25th day of January, 2021.

/s/  *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[148] Dkt. 270 at 13 (emphasis removed).