IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

JOLYN L. SPECTER, as Personal
Representative of the ESTATE OF JAMES E.
SPECTER, M.D., and on behalf of herself, and
the Surviving Family Members including
KEVIN SPECTER, and DAVID W. WOOD,
JR. and MARIANNE WOOD, Individually an
on behalf of the marital community,

                         Plaintiffs,

v.

TEXAS TURBINE CONVERSIONS, INC., a
Texas Corporation, RECON AIR
CORPORATION, a foreign corporation,

                        Defendants.

Case No. 3:17-cv-00194-TMB

ORDER ON RECON AIR
CORPORATION'S MOTION FOR
SUMMARY JUDGMENT
(DKT. 167)

## I.   INTRODUCTION

This matter comes before the Court on Defendant Recon Air Corporation's ("RAC")
Motion for Summary Judgment (the "Motion") as to Plaintiffs' negligence claims against it.[1]
Plaintiffs oppose the Motion and Texas Turbine Conversions, Inc. ("TTC") joins the Motion.[2] The
Motion has been fully briefed and is ready for decision without oral argument.[3] For the following
reasons, the Motion at Docket 167 is **GRANTED**.

---

[1] Dkts. 167 (Motion); 167-1 (Memorandum of Law).

[2] Dkt. 204 (Opposition); 235 (TTC Joinder). TTC and RAC shall be referred to collectively as
"Defendants."

[3] *See* Dkts. 167; 204; 266 (RAC Reply).  RAC requested oral argument on the Motion, however,
that Motion was denied.  *See* Dkts. 267 (Motion for Hearing); 329 (Order Denying Motion for
Hearing).

1

## II.    BACKGROUND

The background facts of this case are set out in detail in this Court's order at Docket 313. The facts are incorporated by reference and will not be repeated here.[4]  Due to a lengthy discovery process and by agreement of the parties, RAC filed its Motion for Summary Judgment on July 14, 2020.[5]  Plaintiffs filed their Opposition to the Motion on August 31, 2020.[6]  RAC filed its Reply on September 22, 2020.[7]

Plaintiffs' main theory of liability is that RAC had a duty to ensure compatibility of the short takeoff and landing ("STOL") Kit and TTC turbine engine conversion kit (the "engine conversion") before releasing it for transport, and that RAC breached its duty by not conducting certain flight testing.[8]  RAC concedes that it had a duty to "confirm the compatibility" of the STOL Kit and TTC engine conversion, but argues that it met its duty by "relying on the government-approved technical data establishing conclusively that these components are, in fact, fully compatible."[9]  RAC first argues that there is no dispute of material fact as to whether RAC

---

[4] *See* Dkt. 313 (Order on Defendants' Motions in Limine re: Certain Expert Testimony).  Plaintiffs filed a stipulated Amended Complaint on January 22, 2021 to remove claims based on their abandoned center of gravity theory and update the Complaint to include claims based on the subject plane's "tendency to roll to the right and yaw."  The claims litigated on summary judgment remain unchanged.  *See* Dkts. 335 (Stipulation Regarding Amended Complaint); 338 at ¶¶ 36, 56 (Amended Complaint).

[5] Dkt. 167.

[6] Dkt. 204.

[7] Dkt. 266.

[8] *See* Dkt. 204 at 3 ("Plaintiffs contended that RAC as the installer of the STOL is responsible for the accident because it failed to determine the compatibility of the STOL [K]it with other modifications."); 5 (RAC failed to perform its duty to ensure compatibility of modifications); *see also* Dkt. 338 at ¶ 54 (Amended Complaint).

[9] Dkt. 167-1 at 2.

2

complied with Federal Aviation Administration ("FAA") and Transport Canada Civil Aviation ("TCCA") regulations pursuant to the Supplemental Type Certificate ("STC") issued for the STOL Kit and the Flight Manual Supplement that expressly confirms that the STOL Kit is compatible with a turbine engine conversion.[10]  RAC explains that, to have an STC approved for the TTC engine conversion and STOL Kit, the STC holders of each were required to present technical data to the FAA and TCCA, which formed the basis of the agencies' compatibility determination.[11]  RAC states that Plaintiffs have not provided any authority that an installer is required to conduct flight testing.[12]  Second, RAC criticizes the opinions of Mark Pottinger ("Pottinger"), one of Plaintiffs' experts.[13]  Pottinger, they assert, is the main expert who has "articulated a theory of liability against RAC . . . that RAC should have conducted an inquiry or some form of testing before releasing the aircraft for transport to the United States to determine the compatibility of the installation of the STOL [K]it and the [TTC] conversion engine."[14]  They argue, however, that Pottinger "does not know what an installer actually does to check or to confirm the compatibility of STCs," and is not credible as an expert witness on this issue.[15]  Third, RAC argues that, even if RAC breached its duty, RAC's alleged breach did not cause the plane crash or Plaintiffs' damages.[16]  Pottinger, the only expert to directly address the issue, was unable to articulate how

---

[10] *Id.* at 9.

[11] *Id.* at 10.

[12] *Id.* at 16–17.

[13] *See id.* at 3–4, 7.

[14] *Id.* at 7.

[15] *Id.* at 7 n.13, 16.

[16] *Id.* at 17–18.

RAC's alleged breach was a cause of the accident.[17]  RAC states that doing additional testing, "without providing the courts . . . with any explanation about what such testing must entail . . .[is] unhelpful for the trier of fact[.]"[18]  RAC argues that Plaintiffs have put forward no evidence that the plane crash would have been prevented had RAC done more testing.[19]  RAC also repeats Defendants' theory throughout this case that the cause of the plane crash was the "weight and balance" of the plane, which was "significantly beyond legal limits."[20]

Plaintiffs oppose the Motion.[21]  Plaintiffs argue, citing no authority or evidence from the record, that "[t]he installer is not simply allowed to rely on FAA circulars, but m[u]st do more."[22]  First, they argue that their three experts, including Pottinger, John Cochran ("Cochran"), and Todd Coburn ("Coburn"), support Plaintiffs' position. Coburn opined that "the installer did not understand these stall characteristics of the aircraft" and that "RAC failed to ensure that when it modified the aircraft it could be properly operated in a stall condition."[23]  Plaintiffs state that RAC "did no engineering studies, no flight testing, nor did it communicate with anybody at [TTC] about it."[24]  Plaintiffs argue that "RAC knew or had reason to know . . . that in a high angle of attack the

---

[17] *Id.* at 18–19

[18] *Id.* at 20.

[19] *Id.* at 20–21.

[20] *Id.* at 23.  RAC argues that "[r]easonable minds cannot differ; Furnia did not run out of rudder authority.  The aircraft was mis-loaded to an illegal configuration that, in combination with the absence of visual cues, produced a dangerous condition which Furnia was unable to control."  *Id.* at 25.

[21] Dkt. 204.

[22] *Id.* at 5.

[23] *Id.* at 6–7.

[24] *Id.* at 7.

aircraft would run out of rudder authority before the stall occurred."[25]  Second, they cite the testimony of Paul Roderick ("Roderick"), the "piloting expert" who conducted a flight test in 2018 and was deposed in a separate case involving an Otter crash.[26]  In his deposition, Roderick testified that "it behooves you to fly it [the plane] around and put it through the paces" after an engine conversion.[27]  Roderick asserts that "you want to make sure that this plane is going to basically perform within its normal parameters," and that the mechanics of the plane work properly, such as different control cables, the trim, etc.[28]  As a test pilot and someone who had previously installed an engine conversion, Plaintiffs say Roderick supports their position.[29]  Third, Plaintiffs argue that RAC cites no authority for the proposition that reliance on STCs or the Flight Manual is dispositive as to whether RAC satisfied its duty.[30]  Fourth, Plaintiffs argue that RAC's failure was a substantial factor in causing the plane crash.[31]  Plaintiffs state that RAC's failure to ensure compatibility resulted in the aircraft losing control due to loss of rudder authority.[32]  Specifically, they cite Pottinger's opinion that RAC did not evaluate the compatibility of the STOL Kit and that had RAC made the inquiry, they would have discovered that "under certain conditions rudder authority was

[25] *Id.* at 8.

[26] *See In re Crash of Aircraft N93PC on July 7, 2013, at Soldotna, Alaska*, No. 3:15-cv-0112-HRH, 2020 WL 3405202, at *4 (D. Alaska June 19, 2020) (denying summary judgment to RAC). Plaintiffs and RAC each cite the 2018 flight test conducted as part of the *In re Crash of Aircraft N93PC* litigation.

[27] *Id.* at 11; Dkt. 204-11 at 60:24-62:3 (Roderick Dep.).

[28] Dkts. 204 at 11; 204-11 at 60:24-62:3.

[29] Dkt. 204 at 11.

[30] *Id.* at 12.

[31] *Id.* at 13.

[32] *Id.*

being lose prior to stall."[33]  Plaintiffs then state, citing Pottinger, that RAC had a duty to warn about the loss of rudder authority issue (referred to as the "right yaw and roll" theory in other Court orders).[34]  Finally, Plaintiffs assert that the loss of rudder authority was a substantial factor in the plane crash, again citing Pottinger's expert report where he states that the subject plane stalled and was uncontrollable because of a loss of rudder authority.[35]  Plaintiffs ultimately conclude that "as if it was assembling a Tinker Toy, RAC just stuck the parts together."[36]  They ultimately state that RAC "created aircraft instability and dangerous rudder conditions," which caused the crash.[37]

In Reply, RAC raises several objections to Plaintiffs' assertions.  They first argue that RAC reasonably relied on STCs and regulations from the FAA and TCCA.[38]  They point to the testimony of Defense expert Robert Carducci ("Carducci"), who outlined the process by which STCs are issued and noted:

> In determining such compatibility, the owner and installer would refer to any and all approved data, that being installation instructions, drawings, flight manual supplements, and the STC itself to determine whether the question of compatibility has been determined beforehand. In the case of the compatibility of the turbine engine and Stolairus STOL modifications, the approved STC data does already point out that the modifications are compatible.[39]

---

[33] *Id.* at 14.

[34] *See id.* at 14, 16.

[35] *See id.* at 17.

[36] *Id.*

[37] *Id.* at 18.

[38] Dkt. 266 at 3.

[39] Dkt. 266-1 at 9.

6

Carducci concludes that the installer "could rely on the FAA" and "have confidence that these modifications as combined complied with the aircraft certification basis."[40]  RAC says they followed the installation instructions by the book.[41]  Second, they argue that none of Plaintiffs' experts provided a reliable opinion about *how* RAC would satisfy its duty to ensure compatibility, if not through compliance with the relevant approved installation instructions.[42]  They note that Cochran "stated no opinion regarding these duties or obligation of an installation facility[,]" that Pottinger is unqualified, and Coburn has "no experience whatsoever with regard to the functions or responsibilities of an installation facility."[43]  Third, they argue that Roderick's deposition testimony is inapposite and was mischaracterized.[44]  Finally, they reiterate their argument that Plaintiffs have failed to demonstrate any causal link between RAC's alleged breach of duty and the accident.[45]

## III.    LEGAL STANDARD

### A.    *Summary Judgment*

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[46] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[40] *Id.* at 9–10.

[41] Dkt. 266 at 3.

[42] *Id.* at 5.

[43] *Id.* at 6–7.

[44] *Id.* at 11–12.

[45] *Id.* at 15.

[46] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

law."[47]  Material facts are those which might affect the outcome of the case.[48]  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[49]  "There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion."[50]  A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[51]  Thus, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[52]

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[53]  Evidence introduced in opposition to a summary judgment motion does not have to be the kind that would be admissible at trial, but may be any type of evidence identified in Fed. R. Civ. P. 56(c).[54]

---

[47] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).

[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[49] *Id.* at 248.

[50] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[51] *Celotex Corp.*, 477 U.S. at 325.

[52] *Anderson*, 477 U.S. at 249.

[53] *Celotex Corp.*, 477 U.S. at 324.

[54] *See, e.g.*, *id.* at 323–24; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

8

However, "conclusory assertions are wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment."[55] "A party opposing a summary judgment motion must produce '*specific* facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."[56]

### B. Negligence Claims

Under Alaska law, in order to establish a prima facie case of ordinary negligence, Plaintiffs must present evidence to satisfy the following elements: (1) duty, (2) breach of duty, (3) causation, and (4) harm.[57] Each are "separate and distinct elements of a negligence claim, all of which must be proven before a defendant can be held liable for the plaintiff's injuries."[58] The existence and extent of duty are questions of law.[59] Breach of duty and causation are questions of fact.[60] However, they "become[] a matter of law where reasonable minds could not differ."[61]

---

[55] *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990); *see also Hilsinger v. Enerco Grp., Inc.*, No. 3:13-cv-00003-TMB, 2014 WL 12569381, at *2 (D. Alaska Sept. 3, 2014); *Mills v. Wood*, 2015 WL 2100849, at *1 (citing *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005) and *Walker*, 917 F.2d at 387 ("In general, in ruling on a motion for summary judgment, a court may not weigh the evidence or judge the credibility of witnesses . . . . However, this rule does not apply to conclusory statements unsupported by underlying facts.")).

[56] *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (quoting *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979)).

[57] *Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204 (Alaska 1996); *see also* Alaska Civ. Pattern Jury Ins. 3.01.

[58] *Id.*

[59] *See, e.g., Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 841 (Alaska 2001).

[60] *See, e.g., Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 255 (Alaska 2000) ("'[F]act-intensive inquiries pertain to the issues of breach, causation, and damages, not to the threshold legal question of whether a duty exists.'" (citation omitted)); *Schumacher v. City & Borough of Yakutat*, 946 P.2d 1255, 1256–57 (Alaska 1997).

[61] *Robles*, 29 P.3d at 841.

9

To determine whether a duty of care exists, Alaska courts apply the following framework:

First, [courts] look for a duty imposed by statute. If none exists, [courts] then determine if the current case falls in the class of cases controlled by existing precedent. If no closely related case law exists, [courts] weigh the public policy considerations enumerated in *D.S.W. v. Fairbanks North Star Borough School District*."[62]

The *D.S.W.* public policy considerations include:

[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.[63]

There is no need, however, to apply the *D.S.W.* factors "if the duty issue is governed by recognized principles of tort law[.]"[64] Relevant here, the Alaska Supreme Court has applied Restatement (Second) of Torts § 324A, which concerns Liability to Third Person for Negligent Performance of Undertaking:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[65]

---

[62] *Estate of Mickelsen ex rel. Mickelsen v. N.-Wend Foods, Inc.*, 274 P.3d 1193, 1199 (Alaska 2012) (citations omitted); *D.S.W. v. Fairbanks North Star Borough School District*, 628 P.2d 554, 555 (Alaska 1981).

[63] *Schumacher*, 946 P.2d at 1257 (citing *D.S.W.*, 628 P.2d at 555).

[64] *State v. Sandness*, 72 P.2d 299, 305 (Alaska 2003).

[65] *Saddler v. Alaska Marine Lines, Inc.*, 856 P.2d 784, 788 (Alaska 1993) (citing Restatement (Second) of Torts § 324A); *see Anderson v. PPCT Mgmt. Sys., Inc.*, 145 P.3d 503, 511 n.34 (Alaska 2006) (same); *City of Kotzebue v. McLean*, 702 P.2d 1309, 1313 (Alaska 1985) (same).

The assembler of a product "depends on the manufacturer to properly design the product," so the assembler's "standard of reasonable care is less onerous."[66]

## IV.   ANALYSIS

The Court finds that RAC did not breach its duty of reasonable care in performing its duties as an installer of the STOL Kit and TTC engine conversion kit on the subject plane.  "A party opposing a summary judgment motion must produce '*specific* facts showing that there remains a genuine factual issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed.'"[67]  Plaintiffs have not put forward sufficient evidence to show that there is a genuine dispute of material fact as it relates to the discharge of RAC's duty as an installer. Accordingly, summary judgment for RAC is appropriate.

### A.   Duty of STOL Kit and Engine Conversion Installer

The scope of RAC's duty to Plaintiffs is a question of law.[68]  Plaintiffs and RAC assert that RAC, as a certified installation facility, had a "duty to determine the compatibility of the installed STCs."[69]  While seemingly reasonable, or even obvious, that RAC had a duty to make sure the modifications were installed correctly and compatible with each other, the parties' analysis is incomplete.  Indeed, the parties cite no authority that states RAC's duty was specifically and exclusively to "determine the compatibility" of the STOL Kit and the engine conversion.  The parties also do not elaborate on what the scope of the duty entails.  Instead, RAC argues it satisfied

---

[66] Am. L. Prod. Liab. 3d § 10:77.

[67] *Steckl*, 703 F.2d at 393 (emphasis in original, internal quotation marks altered) (quoting *Ruffin*, 607 F.2d at 1280).

[68] *Robles*, 29 P.3d at 841.

[69] Dkts. 167-1 at 9; 204 at 18 ("RAC had a duty to assess and ensure the compatibility of the modifications it performed on the accident aircraft.").

this undefined duty by complying with the applicable FAA and TCCA regulations and the STCs and properly installing the STOL Kit and the TTC engine conversion.[70] Plaintiffs disagree, arguing that RAC breached its duty because it was supposed to "do more" to determine compatibility, such as flight testing.[71]

Applying the framework outlined by the Alaska Supreme Court, the Court finds that the duty is properly governed by Restatement (Second) of Torts § 324A ("Section 324A"), which addresses Liability to Third Person for Negligent Performance of Undertaking.[72] The parties have not raised, and the Court has not located, any Alaska statute or case that directly governs the duty owed by an airplane parts installation facility to third party plaintiff-passengers.[73] With no statute or controlling authority on point, the Court then looks to the *D.S.W.* factors, or, "recognized principles of tort law."[74] The Court finds that applying Section 324A is appropriate because it is a longstanding Section of the Restatement (Second) of Torts and has been cited with approval by Alaska courts.[75]

---

[70] *See* Dkt. 167-1 at 9.

[71] *See* Dkt. 204 at 5, 7 ("The only thing RAC did was install the [modifications in accord with the] STCs as per the instructions.").

[72] Restatement (Second) of Torts § 324A.

[73] The court in *In re Crash of Aircraft N93PC* does not discuss the origins of an installer's duty, instead noting that the parties agree that an installer has a "duty to determine compatibility." *See* No. 3:15-cv-0112-HRH, 2020 WL 3405202, at *5.

[74] *See Sandsness*, 72 P.2d at 305.

[75] *See Saddler*, 856 P.2d at 788; *Anderson*, 145 P.3d at 511 n.34; *McLean*, 702 P.2d at 1313. Section 324A also comports with bedrock principles of tort law, such as imposing a duty of reasonable care on the relevant parties.

12

The Alaska Supreme Court applied Section 324A in *Saddler v. Alaska Marine Lines, Inc.*, which serves as persuasive authority in this case.[76] In *Saddler*, two construction employees were injured when a tank full of asphalt material exploded while they were heating it.[77] The employees thought the tank contained an asphalt paving material called AC-5, but instead it contained a different material called CSS-1, which has a much lower boiling point than AC-5, and therefore exploded when the employees began heating the tank.[78] The construction company purchased the asphalt material from Chevron in Washington State.[79] Alaska Marine Lines, Inc. ("AML") pumped the materials into empty tanks owned by the construction company and transported them to Alaska.[80] Plaintiffs brought suit against AML on a number of theories, including negligence, since AML allegedly pumped the wrong asphalt material into the tank used by plaintiffs.[81] AML moved for summary judgment on the negligence claim and argued that it owed no duty to the construction company's employees.[82] The Alaska Supreme Court agreed with plaintiffs, declined to apply *D.S.W.*, and applied Section 324A to find that there was a material issue of fact concerning AML's performance of its assumed duty.[83]

---

[76] *See* 856 P.2d at 788.

[77] *Id.* at 785.

[78] *Id.* at 786.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 786–87.

[83] *Id.* at 788–89.

Case 3:17-cv-00194-TMB   Document 348   Filed 02/05/21   Page 13 of 25

*Saddler* is instructive. There, AML was hired by the construction company to fill tanks and transport asphalt to Alaska for use by construction workers, and here, RAC was hired by TTC to install the STOL Kit and engine conversion for use by Rainbow King Lodge and Plaintiffs as passengers. This Court finds application of Section 324A persuasive because it governs the duties of RAC to third parties such as Plaintiffs.[84] RAC rendered services to TTC, which it should recognize as necessary for the protection of Plaintiffs.[85] The Court finds, and RAC does not appear to dispute, that its failure to exercise reasonable care would increase the chance of harm to Plaintiffs, since a breach of reasonable care could result in the modified plane being unsafe. It is foreseeable, for example, that an incorrectly installed engine conversion could result in harm to passengers riding the plane, even if those passengers did not hire RAC to perform the modifications to the plane. Similarly, failure to "determine the compatibility" of the modifications, which the parties assert is RAC's duty, could result in harm to passengers.

The duty to "exercise reasonable care" imposed by Section 324A includes, but is broader than, the duty to determine compatibility as advocated by the parties.[86] The primary questions

---

[84] Furthermore, Section 324A comports with overarching principles of torts law, by imposing a duty to "exercise reasonable care." Restatement (Second) of Torts § 324A.

[85] *See* Restatement (Second) of Torts § 324A ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking . . ."); Dkt. 167-1 at 4 (". . . RAC did indeed fulfill its duty to determine the compatibility of the STOL [K]it and the turbine engine conversion.").

[86] The Court views Plaintiffs' arguments regarding the RAC's obligation to conduct additional flight testing as applicable to Plaintiffs' argument that RAC *breached* its duty to determine compatibility. The Court views the alleged duty to determine compatibility as the duty to ensure the modifications made by RAC—here, the installation of the STOL Kit and engine conversion— comply with the relevant STCs, FAA, and TCCA rules and guidelines, and that the modifications were installed correctly and worked as intended by the manufacturer. While the primary focus of Plaintiffs' case before the Court involves the compatibility and overall safety and design of the

14

before the Court, then, are whether RAC breached its duty to exercise reasonable care and, if so, whether that breach caused the subject plane crash.

### B. Breach of RAC's Duty to Exercise Reasonable Care

Plaintiffs allege that RAC negligently performed its duty to ensure compatibility and states that RAC "m[u]st do more."[87] In order for Plaintiffs to prevail on the Motion, the Court must find that there is a genuine dispute of material fact on the issue of whether RAC exercised reasonable care as an installer of the STOL Kit and engine conversion. Plaintiffs have not put forward more than a scintilla of evidence to prove their case, and thus RAC must prevail on the Motion. In opposition to the Motion, Plaintiffs primarily cite their experts and the testimony of Paul Roderick, a pilot who conducted a flight test and was deposed in *In re Crash of Aircraft N93PC on July 7, 2013, at Soldotna, Alaska* ("*In re Crash of Aircraft N93PC*"), a different case involving a converted Otter plane.[88] However, the evidence put forward has either been deemed inadmissible by the Court or is otherwise inapposite for this inquiry.

#### 1. Plaintiffs' Expert Testimony

Plaintiffs cite the written reports and/or deposition testimony of experts Mark Pottinger, John Cochran, and Todd Coburn in attempt to establish a dispute of material fact as to whether RAC exercised reasonable care.[89] None of the proffered expert testimony pertains to the duties of RAC as an installer or whether RAC satisfied its duty of reasonable care.

---

STOL Kit and engine conversion, the Restatement and Alaska law does not limit the duty of an installer to only this context.

[87] Dkt. 204 at 5.

[88] No. 3:15-cv-0112-HRH, 2020 WL 3405202, at *5–6.

[89] Dkt. 204 at 5–9.

15

First, relevant to the Court's analysis is a series of conclusions made by Plaintiffs' expert Pottinger in his expert report, the most of relevant of which include:

> 5. With respect to controllability at high angles of attack, [RAC] did not evaluate the compatibility of the STOL Kit with the turbine conversion.

> 6. Had [RAC] made an inquiry, it would have learned that under certain conditions rudder authority was being lost prior to stall; and, that the STOL Kit would have increased the airspeed difference between stall and loss of rudder authority in power on, high angle of attack flight conditions.[90]

Pottinger asserts in his expert report and deposition testimony that RAC "should at least make some additional inquiry."[91] However, RAC argues that Pottinger is "lacking any experience as a mechanic, installer, or inspector" and stated in his deposition that he did not "know what people do to discharge their obligations to check for the compatibility of STCs."[92] Pottinger also stated that it would be RAC's "obligation to figure out" what it had to do to comply with the applicable STCs and government regulations.[93] In opposition, Plaintiffs focus on Pottinger's findings regarding the alleged stall and lack of rudder as causes of the accident, as opposed to what obligations RAC had to "ensure compatibility" or otherwise discharge its duty to Plaintiffs.[94] The parties' dispute over Pottinger's expert report and testimony is largely moot, however, because the Court previously found that Pottinger is not qualified to offer Opinions 5 and 6 as listed above, or

---

[90] Dkt. 313 at 16–17 (citing Pottinger Expert Report).

[91] Dkts. 167-1 at 1–2; 204 at 15; 204-6 at 110:8-14 (Pottinger Tr.).

[92] Dkts. 167-1 at 16–17; 167-4 at 14:8-13 (Pottinger Tr.).

[93] Dkt. 167-4 at 14:21-23.

[94] *See* Dkt. 204 at 7–9.

"other topics such as the legal, regulatory, or testing obligations of TTC or RAC[.]"[95]   To the
extent Pottinger's admissible opinions tend to support Plaintiffs' theory that the subject plane
stalled, yawed right, and ran out of rudder before crashing, those opinions have no bearing on
whether RAC satisfied its duty to exercise reasonable care as an installer of the STOL Kit and
engine conversion.  Pottinger's opinions, therefore, are either inadmissible or inapposite and do
not in any way support this Court finding a dispute of material fact on the issue of RAC's
performance.

Second, Plaintiffs cite an expert opinion from Cochran, who opined that:

> **Opinion 1.** The accident aircraft . . . crashed because its stability and control
> characteristics had been changed by the STCs of [TTC] and Stolairus, which were
> implemented by [RAC], that changed the engine and propeller and the wing,
> respectively, of the accident aircraft so that the pilot was unable to control it during
> an attempted takeoff from East Wind Lake.[96]

RAC argues that Cochran's opinion does not establish anything about whether RAC performed its
duty of reasonable care in its installation of the STOL Kit and engine conversion.[97]   Plaintiffs cite
Cochran's opinion to support their position that the subject plane stalled, yawed right, and ran out
of rudder before crashing, but do not point to any discussion about RAC's duty as an installer or
whether RAC satisfied its duty.  Furthermore, Plaintiffs admit that the scope of Cochran's expert
testimony was to provide "opinions as to the cause or causes, of the accident."[98]   The Court does

---

[95] Dkt. 313 at 19.  The Court was very specific in limiting Pottinger's testimony to his "opinions
that relate to analyzing the crash" and that Pottinger "may use flight data, the AFMS, and other
information to inform his opinion, provided his use of that information does not result in him
providing opinions about the duties or obligations of TTC or RAC."  *Id.*

[96] Dkt. 313 at 9–10 (citing Cochran Expert Report).

[97] Dkt. 266 at 6.

[98] Dkt. 204 at 5 (citing Cochran Expert Report).

not find anything in Cochran's report or testimony discussing RAC's duty or whether RAC acted reasonably, thus, Cochran's report and testimony fail to create a genuine dispute of material fact as to whether RAC breached its duty.

Third, Plaintiffs cite the expert report and testimony of Coburn, who opined that "[t]he aircraft experienced a stall during takeoff, causing the aircraft to touch down before taking off again, veering right, and crashing into the tundra."[99] Coburn further stated that "nobody seems to know what effect a [STOL] [K]it has on the stall characteristics of this aircraft" and that compliance with the STC alone "does not in itself assure that any design or alteration which was granted the type certificate is safe."[100] RAC argues that Coburn's opinions say "nothing about the supposed duties of an installation facility" and argue that the testimony cited by Plaintiffs clearly refers "to the turbine engine conversion kit manufactured by [TTC]."[101] Coburn's expert report and testimony suffer from similar deficiencies as the opinions of Plaintiffs' other experts. Coburn's opinions say nothing about the RAC's duties or whether RAC acted as a reasonable installer. While the deposition transcript excerpt provided to the Court is not entirely clear, the Court agrees that the excerpt does not discuss any testing obligation of RAC—only TTC. Finally, while the Court finds merit to Coburn's argument that compliance with the STCs and government regulations does not ensure safety in all scenarios, Coburn does not discuss how RAC acted unreasonably or otherwise breached its duty to Plaintiffs.

---

[99] *Id.* at 6; Dkt. 313 at 23 (citing Coburn Expert Report).

[100] Dkts. 204 at 6; 204-4 at 142:8-14 (Coburn Tr.); 204-5 at 2 (Coburn Rebuttal Report).

[101] Dkt. 266 at 7.

The only expert who provided germane testimony on whether RAC acted reasonably is Defense expert Robert Carducci, who spent years "certifying the design and [STCs]" for TCCA.[102] Carducci opined that the "installer could rely on the FAA and its very competent and cognizant group of certification engineers, aeronautical engineers, and flight test pilots to have confidence that the FAA also endorsed these modifications as combined as being compatible and complying with the aircraft certification basis."[103]  RAC argues that installers could "reasonably rely" on the STCs to discharge their duty, and Carducci's opinion tends to support RAC's position.[104] Plaintiffs' experts do not negate Carducci's opinion as it relates to RAC's duty or performance.

Plaintiffs' experts, through their reports and deposition testimony, fail to establish a genuine dispute of material fact as it pertains to whether RAC, as an installer, breached its duty of reasonable care to Plaintiffs.  Even though the expert reports and testimony discuss the sequence of events and alleged product defect that resulted in the plane crash, this evidence does not put into dispute any triable issue of fact as it pertains to RAC's duty to Plaintiffs.

### 2. Paul Roderick Testimony

Both parties discuss a flight test in 2018 of a wheeled DHC-3 Otter that had the STOL Kit and engine conversion installed.[105]  The flight test was conducted as part of the *In re Crash of Aircraft N93PC* litigation.[106]  RAC argues that the flight testing "established that the DHC-3 aircraft . . . was completely controllable when operated within the certified [center of gravity]

---

[102] *Id.* at 3.

[103] *Id.* at 5; Dkt. 266-1 at 10 (Excerpt of Carducci Expert Report).

[104] Dkt. 266 at 3, 5.

[105] *See* Dkts. 167-1 at 21; 204 at 10.

[106] *See* No. 3:15-cv-0112-HRH, 2020 WL 3405202, at *4–6 (discussing flight test).

limits" and that "the STOL [K]it and the Texas Turbine engine are fully compatible and that their installation [did] not result in any loss of control."[107]  On the other hand, Plaintiffs cite deposition testimony from Paul Roderick, the pilot in charge of the 2018 flight test, as evidence that "[a]n installer like RAC can't simply rely upon the STCs."[108]  Roderick, when deposed in *In re Crash of Aircraft N93PC*, stated:

> A. Well, since we have had them [engine conversions] in the past, I mean, we didn't feel it was necessary to perform a compatibility test, but we did do flight testing on it.
>
> ***
>
> Q: Why did you do the flight testing?
>
> A. Well, because any time – we do flight testing even after 100-hour inspection. Any time that the airplane has been in for any type of inspection, we do a thorough preflight on it before it leaves the ground and, you know, it gets signed off by multiple mechanics that it's been, you know, indeed checked as far as any maintenance anomalies that may be found. Then a pilot, of course, does a thorough preflight and then it gets, you know, a ground runup. And then sometimes, if we're really – if we're doing a major alteration, we might even do a high-speed runup down the runway. Maybe even perform a high-speed runup and then possibly perform a high-speed runup with some lift and then settle back down just to make sure that – say, we've changed the wings or any, you know, of the control surfaces and have had major alterations of, say, the balance of a control service that we – basically, it behooves you to flight test.  So anytime there's a – that you do one of these conversions, it's pretty major surgery. You're rescanning parts of the airplane. You may be rebuilding control surfaces. And certainly, you have – the whole front end is completely rebuilt. Sometimes the firewall is completely rebuilt. It's a new engine mount. It's new – you know, you weigh – you do another weight and balance, a modern one, and then you change the avionics typically. So it's a whole new panel. So it just behooves you to go fly it around and put it through the paces.
>
> Q. And I understand that you do that.
>
> A. Right.
>
> Q. I understand you do that, but I guess the question is: why do you do that?

---

[107] Dkt. 167-1 at 21–22 (emphasis removed).

[108] Dkt. 204 at 11.

A. The big question is through – I mean, before you put passengers in it, you want to be sure that this plane is going to basically perform within its normal parameters. Because they're – even when you're, you know, doing these conversions you're even changing sometimes the control cables and you want to make sure everything's adjusted, that the trim is right, that the plane's feel – you know, basically the control pressures are normal, and it's, you know – I don't know anybody who would get into a plane after a major alteration who wouldn't flight test it before, but people –

Q. Sure. So for safety?

A. Basically for safety, yeah. That's the other thing.[109]

RAC makes a few points in response to Roderick's testimony. First, it notes that Roderick has not testified in this case.[110] Second, it states that Plaintiffs omit the fact that Roderick testified that he "personally knows" that the STOL Kit and engine conversion are compatible.[111] Third, RAC argues that Plaintiffs misconstrue Roderick's testimony by "implying that he conducted flight testing after the installation of a [TTC] [c]onversion and STOL [K]it to determine the compatibility of the two components."[112] RAC argues that Roderick stated no such thing, and instead, his testimony pertains to *preflight* testing, which is distinct from compatibility testing.[113] RAC also notes that Bobby Bishop of TTC performed the exact preflight testing on the subject aircraft as Roderick discussed in *In re Crash of Aircraft N93PC*.[114]

---

[109] Dkt. 204-11 at 59:11-62:3 (Roderick Tr.).

[110] Dkt. 266 at 11.

[111] *Id.*

[112] *Id.* at 12.

[113] *Id.*

[114] *Id.*; *see* Dkt. 167-9 at 215:3-8 (Bishop Tr.) ("I believe that I performed the engine runs and test flight in Geraldton.").

The Court finds that Roderick's testimony does not establish a dispute of material fact as to whether RAC performed with reasonable care in the discharge of its duty as an installer. First, Roderick was not deposed in this case, and Roderick is not qualified as an expert in this case, which constricts the Court to a limited record on summary judgment. While Roderick has installed at least one STOL Kit and engine conversion, he is a piloting expert and not an installer.[115] Second, while the deposition testimony provided to the Court tends to show that the STOL Kit installation and engine conversion are major modifications—which is not disputed in this case—Roderick's testimony as to RAC's duty or performance of its duty is unclear at best. Roderick makes a distinction between a "compatibility test" and "preflight testing," which supports RAC's assertion that Roderick's testimony is inapposite.[116] Roderick testified that he did not think it was necessary to perform a "compatibility test."[117] Furthermore, Roderick is not clear as to which entity should conduct "preflight testing." Even if Roderick's testimony is construed as evidence that RAC acted unreasonably in not conducting its own preflight testing, there is no evidence that a breach of

---

RAC also notes that in its order denying reconsideration of RAC's Motion for Summary Judgment in *In re Crash of Aircraft N93PC*, the court denied reconsideration *not* because Roderick established a triable issue of fact relating to the duty and performance of RAC, but because there was "no evidence in the record as to what Bobby Bishop did in 2010." *See* Dkts. 266 at 11; 266-3 at 4 (Order Denying RAC Motion for Reconsideration). Here, the court's discussion in *In re Crash of Aircraft N93PC* upon reconsideration is significant because there is evidence that the preflight test was conducted. The court in *In re Crash of Aircraft N93PC* also cites the testimony of Arthur Coffman, one of Plaintiffs' experts, for the proposition that compatibility is the responsibility of the installer and that "[e]very aircraft . . . must be tested individually[.]" *See In re Crash of Aircraft N93PC*, No. 3:15-cv-0112-HRH, 2020 WL 3405202, at *6. However, Coffman is not an expert in this case, and the facts here are distinguishable because here, unlike *In re Crash of Aircraft N93PC*, a preflight test was conducted.

[115] Dkt. 204 at 10.

[116] *See* Dkt. 204-11 at 59:11-62:3.

[117] *Id.*

RAC's duty on that basis caused the subject accident, since Bobby Bishop of TTC conducted preflight testing directly after RAC completed the modifications (and before the plane was delivered to Rainbow King Lodge). Third, Roderick focuses on preflight testing in the context of confirming that the plane "perform[s] within its normal parameters."[118] Plaintiffs do not allege that the STOL Kit or engine conversion performed outside of their "normal parameters"[119] but instead allege that the normal parameters (as intended by TTC) constitute a design defect that went unnoticed by RAC and subsequently caused the plane crash.[120] The Court will not permit Plaintiffs to shoehorn a design defect claim against TTC into a negligence claim against RAC. Roderick's deposition testimony does not establish a genuine dispute of material fact as it pertains to RAC's performance of its duty to Plaintiffs.

### 3. Compliance with STCs, FAA, and TCCA Requirements

RAC advocates for a standard that would absolve installers of liability if they "reasonably rely[] on the government-approved technical data establishing conclusively that these components are, in fact, fully compatible."[121] The parties, and the parties' experts, do not dispute that the FAA and TCCA approved of the STC for the STOL Kit as well as the accompanying Flight Manual Supplement that permits the installation of a STOL Kit onto a plane with a TTC engine conversion.[122] While undisputed compliance with these instructions supports RAC's position that

---

[118] *Id.*

[119] In fact, it is undisputed that RAC complied with all applicable STCs, FAA, and TCCA requirements in its installation of the STOL Kit and engine conversion.

[120] *See, e.g.*, Dkt. 204 at 13 (noting the "failure of RAC to assess and ensure compatibility, which resulted in aircraft uncontrollability an[d] loss of rudder authority in stall conditions.").

[121] Dkt. 167-1 at 2.

[122] *See, e.g.*, Dkts. 167-1 at 2–3; 204 at 17 ("RAC . . . install[ed] the STC's as [] per instructions.").

it exercised reasonable care, the Court does not find that, as a matter of law, such compliance automatically absolves installers of tort liability. There may be circumstances, not before the Court on this Motion, where a plaintiff can allege a viable negligence case against an installer, even where the installer complied with the applicable STCs and government regulations. However, this is not the case.

### C. Causation

Under Alaska law, Plaintiffs must also present evidence that RAC's breach of its duty to Plaintiffs caused the subject accident.[123] RAC asserts that neither Plaintiffs nor their experts point to "any act or omission . . . that would have somehow prevented this accident. In other words, Plaintiffs have not provided any causal link between RAC's alleged breach of duty and the accident."[124] RAC argues that Plaintiffs have not provided the Court "with any explanation about what such testing must entail."[125] In opposition, Plaintiffs argue that RAC did not confirm the compatibility of the STOL Kit and engine conversion, and that "RAC's failure to do so and failure to warn was a substantial factor in this accident."[126] The Court need not reach the question of causation, since the Court finds that there is no dispute of material fact as to whether RAC performed its duty as an installer.

//

//

---

[123] *See Lyons*, 928 P.2d at 1204; *see also* Alaska Civ. Pattern Jury Ins. 3.01.

[124] Dkt. 167-1 at 19–20.

[125] *Id.* at 20.

[126] Dkt. 204 at 18. The Court also rejects Plaintiffs' arguments about RAC's alleged negligent failure to warn. Plaintiffs have put forward no evidence that creates a material dispute of fact as to whether RAC breached its duty by not providing additional warnings.

//

//

//

## V.    CONCLUSION

Accordingly, for the above reasons, RAC's Motion for Summary Judgment at Docket

167 is **GRANTED**.  Plaintiffs' negligence claims against RAC are dismissed with prejudice.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 5th day of February, 2021.

/s/    *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE