IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

JOLYN L. SPECTER, as Personal
Representative of the ESTATE OF JAMES E.
SPECTER, M.D., and on behalf of herself, and
the Surviving Family Members including
KEVIN SPECTER, and DAVID W. WOOD,
JR. and MARIANNE WOOD, Individually an
on behalf of the marital community,

        Plaintiffs,

v.

TEXAS TURBINE CONVERSIONS, INC., a
Texas Corporation, RECON AIR
CORPORATION, a foreign corporation,

        Defendants.

Case No. 3:17-cv-00194-TMB

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON
FEDERAL PREEMPTION AND GARA
(DKT. 190)

## I. INTRODUCTION

   This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment on Federal Preemption and GARA (the "Motion").[1] Defendants Texas Turbine Conversions, Inc. ("TTC") and Recon Air Corporation ("RAC," and together with TTC, "Defendants") oppose the Motion.[2] The Motion has been fully briefed and is ready for decision without oral argument.[3] For the following reasons the Motion at Docket 190 is **GRANTED in part** and **DENIED in part**.

---

[1] Dkts. 190 (Motion); 190-1 (Memorandum of Law).

[2] Dkts. 212 (TTC Opposition); 221 (RAC Opposition).

[3] Dkts. 190; 190-1; 212; 221; 286 (Plaintiffs' Reply).

1

## II.   BACKGROUND

The background facts of this case are set out in detail in this Court's order at Docket 313. The facts are incorporated by reference and will not be repeated here.[4]  Due to a lengthy discovery process and by agreement of the parties, Plaintiffs filed their Motion for Partial Summary Judgment on July 15, 2020.[5]  TTC and RAC filed their Oppositions to the Motion on August 31, 2020.[6]  Plaintiffs filed their Reply on September 22, 2020.[7]

Plaintiffs bring the Motion to preclude Defendants from asserting an affirmative defense that Plaintiffs' claims "are preempted by federal law."[8]  Plaintiffs ask the Court to grant summary judgment and "instruct that no testimony asserting that [Federal Aviation Administration ("FAA")] certification means an aircraft is safe be allowed."[9]  The Motion addresses three issues.

 First, Plaintiffs assert that federal law, as interpreted by the Ninth Circuit, does not preempt their state law-based tort claims.[10]  Second, they argue that the testimony of defense expert Lawrence Timmons ("Timmons") that FAA certification "means that an aircraft complies with all

---

[4] *See* Dkt. 313 (Order on Defendants' Motions in Limine re: Certain Expert Testimony).  Plaintiffs filed a stipulated Amended Complaint on January 22, 2021, to remove claims based on their abandoned center of gravity theory and update the Complaint to include claims based on the subject plane's "tendency to roll to the right and yaw."  *See* Dkts. 335 (Stipulation Regarding Amended Complaint); 338 at ¶¶ 36, 56 (Amended Complaint).  The claims litigated on summary judgment remain unchanged.

[5] Dkt. 190.

[6] Dkts. 212; 221.

[7] Dkt. 286.

[8] Dkts. 190-1 at 2; 17 at 16 ¶ 14 ("Plaintiffs' claims are preempted by federal law since the turbine conversion kit sold by Texas Turbine was certified as safe and airworthy by the Federal Aviation Administration.") (TTC Answer to Complaint).

[9] Dkt. 190-1 at 2.

[10] *Id.* at 3.

2

applicable federal regulations and is airworthy" should be inadmissible.[11]  Third, Plaintiffs argue that the General Aviation Revitalization Act of 1994 ("GARA") does not bar their claims.[12]

In response, TTC first argues that Plaintiffs' failure to warn claims are preempted by federal law and that compliance with FAA regulations is admissible evidence that the TTC engine conversion was not defective.[13]  TTC asserts that it "satisfied all relevant federal warning requirements" and that the cause of the accident was Pilot John Furnia's negligence, not inadequate instructions in the Airplane Flight Manual ("AFM") or Airplane Flight Manual Supplement ("AFMS").[14]  TTC argues that Ninth Circuit law preempts "state law claims based on airlines' failure to warn air passengers[.]"[15]  It further argues that "any changes to the content of FAA approved flight manuals . . . must go through the FAA approval process," and thus TTC could not make alterations to the flight manuals without FAA approval, even if it wanted to.[16]  Second, TTC argues that defense expert Timmons is qualified under *Daubert* and that his testimony is admissible at trial.[17]  Third, TTC joins RAC's opposition regarding Plaintiffs' GARA argument.[18]

---

[11] *See id.*

[12] *Id.*; *see* 49 U.S.C § 40101 *et seq.*

[13] Dkt. 212 at 2–3.

[14] *Id.* at 8–9.

[15] *Id.* at 11 (citing *Makhzoomi v. Sw. Airlines Co.*, 419 F. Supp. 3d 1136, 1153–54 (N.D. Cal. 2019 (quoting *Montalvo v. Spirit Airlines*, 508 F.3d 464, 472 (9th Cir. 2007))).

[16] Dkt. 212 at 12.

[17] *Id.* at 15, 18; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–96 (1993) (*Daubert I*).

[18] Dkt. 212 at 27.

3

RAC filed a response reiterating many of the same points raised by TTC.[19]  RAC points out that it "did not assert an affirmative defense predicated on federal preemption," though it joins TTC's opposition with respect to the issue.[20]  In a similar vein, RAC argues that Plaintiffs' arguments against Timmons pertain to Timmons' opinions "as to TTC, not RAC."[21]  RAC briefed the GARA issue, arguing that "Plaintiffs' argument is conclusory, at best, and should be dismissed as a matter of law."[22]  RAC discusses GARA's "'rolling trigger date,'" which "occurs when a new component that is alleged to have caused the accident replaces an existing component of the aircraft or is added to the plane."[23]  RAC cites a California case, *Hiser v. Bell Helicopter Textron, Inc.* for the proposition that mere modification "does not restart the limitation period under GARA," but that "'replac[ing] an original item'" would.[24]  RAC argues that "[P]laintiffs' allegation is based on the replacement or modification of the engine system . . . [and] insufficient to remove protections afforded by GARA."[25]

In reply, Plaintiffs first argue that the authority cited by TTC regarding preemption is inapposite because it relates to passenger warnings as opposed to warnings in the AFM or AFMS.[26]  Plaintiffs further argue that the regulations cited by TTC "have nothing to do with adding warnings

---

[19] Dkt. 221 at 4, 6.

[20] *Id.* at 4.

[21] *Id.* at 8.

[22] *Id.* at 10.

[23] *Id.* at 12 (citation and internal quotation marks omitted).

[24] *Id.* at 13 (quoting *Hiser v. Bell Helicopter Textron, Inc.*, 111 Cal. App. 4th 640, 650 (Cal. Ct. App. 2003)).

[25] *Id.* at 14.

[26] Dkt. 286 at 3–4.

4

to an aircraft manual and would not prohibit [TTC] from doing so."[27]  Second, Plaintiffs reiterate their objections to the proffered Timmons testimony as it relates to preemption because "it is a purely legal question."[28]  Finally, Plaintiffs argue that GARA does not bar their claims and that Defendants' reliance on *Hiser* is misplaced, especially since the "new components added to the aircraft to change the engine system from piston to turbine resulted in a fresh limitation period if those parts are the cause of the accident[.]"[29]

### III. LEGAL STANDARD

*A.    Summary Judgment*

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[30] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31]  Material facts are those which might affect the outcome of the case.[32]  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[33]  "There is no genuine issue of fact if, on the record taken as a whole, a

---

[27] *Id.* at 5.

[28] *Id.* at 6.

[29] *Id.* at 9.

[30] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[31] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).

[32] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[33] *Id.* at 248.

5

rational trier of fact could not find in favor of the party opposing the motion."[34]  A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[35]  Thus, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[36]

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[37]  Evidence introduced in opposition to a summary judgment motion does not have to be the kind that would be admissible at trial, but may be any type of evidence identified in Fed. R. Civ. P. 56(c).[38]  However, "conclusory assertions are wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment."[39]  "A party opposing a summary judgment

---

[34] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[35] *Celotex Corp.*, 477 U.S. at 325.

[36] *Anderson*, 477 U.S. at 249.

[37] *Celotex Corp.*, 477 U.S. at 324.

[38] *See, e.g.*, *id.* at 323–24; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

[39] *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990); *see also Hilsinger v. Enerco Grp., Inc.*, No. 3:13-cv-00003-TMB, 2014 WL 12569381, at *2 (D. Alaska Sept. 3, 2014); *Mills v. Wood*, 2015 WL 2100849, at *1 (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005) and *Walker*, 917 F.2d at 387 ("In general, in ruling on a motion for summary judgment, a court may not weigh the evidence or judge the credibility of witnesses . . . . However, this rule does not apply to conclusory statements unsupported by underlying facts.")).

motion must produce '*specific* facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."[40]

## B. Federal Preemption

"It is well established that Congress has the power to preempt state law."[41] "Congress' intent may be 'explicitly stated in a statute's language or implicitly contained in its structure and purpose.'"[42] As stated by the Ninth Circuit:

> There are two types of implied preemption: conflict preemption and field preemption. Courts may find conflict preemption when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law. Implied preemption exists when federal law so thoroughly occupies a legislative field "as to make reasonable the inference that Congress left no room for the States to supplement it." Thus, field preemption occurs when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law.[43]

"In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable."[44]

## C. GARA

Additionally, Defendants claim that Plaintiffs' claims are be barred by GARA, which "precludes actions against manufacturers of general aviation aircraft if the part that allegedly

---

[40] *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (quoting *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979)).

[41] *Montalvo*, 508 F.3d at 470 (italics and citation omitted) (citing U.S. Const. art. VI).

[42] *Id.* (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1997)).

[43] *Id.* (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

[44] *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 811 (9th Cir. 2009); *see Ventress v. Japan Airlines*, 747 F.3d 716, 721 (9th Cir. 2014) (finding that "pilot qualifications and medical standards for airmen, unlike aircraft stairs, are pervasively regulated"), *cert. denied.* 574 U.S. 863 (2014).

caused the accident is more than 18 years old."[45]  According to GARA, the 18-year clock starts in accord with the following:

> (a)  IN GENERAL.—Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred—
>
> > (1) after the applicable limitation period beginning on—
> > > (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or
> > > (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or
> >
> > (2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.[46]

### D.  Rule 702 and Daubert

FRE 702 controls the admissibility of an expert's opinion.  FRE 702, as modified in light of *Daubert*, provides that:

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[45] *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1156 (9th Cir. 2000).

[46] *See* Pub. L. No. 103–298, 108 Stat. 1552 (1994), *as amended by* Pub. L. No. 105–102, § 3(e), 111 Stat. 2215 (1997) (codified at 49 U.S.C. § 40101 note (1997)); *id.* § 2(a).

> (d) the expert has reliably applied the principles and methods to the facts of the case.[47]

The principles of *Daubert* apply to both scientific[48] and "technical" or "other specialized" knowledge.[49]  When determining the admissibility of such evidence in advance of trial, the court undertakes a "gatekeeping" function to ensure that the jury's consideration of evidence is not contaminated by irrelevant or scientifically unsupported testimony.[50]

The Supreme Court established a two-part analysis for determining whether expert testimony is admissible: (1) "the trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue,'" i.e., whether the proffered testimony is reliable; and (2) the trial court "must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact."[51]

The reliability inquiry is "a flexible one."[52]  Several factors can be used to determine the reliability of expert testimony: (1) "whether a theory or technique can be tested"; (2) "whether it has been subjected to peer review and publication"; (3) "the known or potential error rate of the

---

[47] Fed. R. Evid. 702; *see Daubert I*, 509 U.S. at 579.

[48] *Daubert I*, 509 U.S. at 595.

[49] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

[50] *See United States v. Alatorre*, 222 F.3d 1098, 1100–03 (9th Cir. 2000); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019).

[51] *United States v. Finley,* 301 F.3d 1000, 1008 (9th Cir. 2002) (quoting *Daubert I,* 509 U.S. at 591–93); *Estate of Barabin v. AstenJohnson Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) ("We have interpreted Rule 702 to require that '[e]xpert testimony . . . be both relevant and reliable.'") (quoting *United States v. Vallejo,* 237 F.3d 1008, 1019 (9th Cir. 2001)).

[52] *Kumho Tire*, 526 U.S. at 150.

theory or technique"; and (4) "whether the theory or technique enjoys general acceptance within the relevant scientific community."[53]

The relevancy inquiry requires the court to ensure that the proposed expert testimony is "relevant to the task at hand," i.e., that it "logically advances a material aspect of the proposing party's case."[54]  Once an expert "meets the threshold established by [FRE] 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give that testimony."[55]

## IV.  ANALYSIS

The Court finds that Plaintiffs' remaining failure to warn claim[56] is not preempted by federal law and that defense expert Timmons and his proffered testimony, with one exception, meets the *Daubert* standard.  The Court will address each issue in turn.

### A.  Federal Preemption: FAA Regulations

Defendants argue that Plaintiffs' failure to warn claims are preempted by federal law, since implied preemption is found through the Federal Aviation Act and regulations promulgated by the

---

[53] *United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94).

[54] *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II* "); *Estate of Barabin*, 740 F.3d at 463; *Primiano*, 598 F.3d at 656 ("'Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'") (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).

[55] *Primiano*, 598 F.3d at 565; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("'The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.'") (internal alterations omitted) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013)).

[56] *See* Dkt. 339 at 26 (Order re: TTC Motion for Summary Judgment at Dkt. 173) (denying summary judgment as to one of Plaintiffs' failure to warn claims).

10

FAA.[57]  The Court finds that Plaintiffs' claims are not preempted by FAA regulations and thus **GRANTS** Plaintiffs' Motion to preclude Defendants from asserting an affirmative defense on that basis.

In order for the Court to find implied field preemption[58] of Plaintiffs' failure to warn claim, the Court must find that Congress "left no room" for state tort law to impose duties on airplane manufacturers and that the AFM and AFMS are not governed by "pervasive regulations."[59]  The Court previously denied summary judgment to TTC as to one of Plaintiffs' failure to warn claims against TTC, stating that "there is a genuine dispute of material fact as to whether the warnings (or lack of warnings) in the AFM and AFMS were sufficient to put an ordinary pilot on notice of potential risks associated with different flap settings."[60]  The parties dispute how Ninth Circuit law should be applied in this case.  Plaintiffs argue that the Ninth Circuit has found that state product liability claims are not preempted by federal law.[61]  On the other hand, Defendants argue that through the FAA, "'any state tort claim based on a theory that the warnings required by the agency are insufficient'" are preempted.[62]  Defendants further argue that the FAA must approve the AFM

---

[57] Dkt. 212 at 10–13.

[58] Defendants do not argue that Plaintiffs' claims are preempted due to federal conflict preemption. The Court agrees.  Alaska products liability law applicable in this case does not "actually conflict" or "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law" governing the subject plane and AFM or AFMS. *Montalvo*, 508 F.3d at 470.

[59] *See Montalvo*, 508 F.3d at 470; *Martin*, 555 F.3d at 811.

[60] Dkt. 339 at 26.

[61] Dkt. 190-1 at 5; s*ee Martin*, 555 F.3d at 808 (stating that the FAA "preserves state remedies").

[62] Dkt. 212 at 11 (quoting *Martin*, 555 F.3d at 810).

and AFMS, and therefore even if Alaska law required the warnings suggested by Plaintiffs, "TTC . . . could not independently" add them.[63]

The Ninth Circuit case most on point, and cited by the parties, is *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, which concerned a personal injury claim brought by a passenger against a manufacturer and others, due to an alleged defect in the airstairs on an airplane.[64] The court rejected the manufacturer's argument that "defective product claims are preempted by the federal certification process required for every plane design" and instead found that "[t]here's no indication that the agency . . . pervasively regulate[d] every aspect of plane design."[65] The court contrasted *Martin* with *Montalvo v. Spirit Airlines*, a case in which the court found that certain failure to warn claims brought by airplane passengers were preempted by federal law.[66] While the FAA maintained "pervasive regulations" of warnings to airline passengers, it did not have the same regulatory scheme for airstairs.[67]

Plaintiffs argue the case here is more like *Martin*, while Defendants argue the case is more like *Montalvo*. The Court agrees with Plaintiffs. The parties cite 14 Code of Federal Regulations ("C.F.R.") § 21.95 (approval of minor changes in type design) and § 21.97 (approval of major changes in type design) as the FAA regulations that most directly govern the contents of the AFM and AFMS.[68] Section 21.95 states that "[m]inor changes in a type design may be approved under

---

[63] Dkt. 212 at 12.

[64] *Martin*, 555 F.3d at 810–12.

[65] *Id.* at 812.

[66] *Id.* at 809–12; *Montalvo*, 508 F.3d at 469–73.

[67] *Martin*, 555 F.3d at 809–11.

[68] *See* Dkts. 212 at 12; 286 at 4–5.

12

a method acceptable to the FAA before submitting to the FAA any substantiating or descriptive data."[69]  Section 21.97 states:

> (a) An applicant for approval of a major change in type design must—
>
>> (1) Provide substantiating data and necessary descriptive data for inclusion in the type design;
>>
>> (2) Show that the change and areas affected by the change comply with the applicable requirements of this subchapter, and provide the FAA the means by which such compliance has been shown; and
>>
>> (3) Provide a statement certifying that the applicant has complied with the applicable requirements.
>
> (b) Approval of a major change in the type design of an aircraft engine is limited to the specific engine configuration upon which the change is made unless the applicant identifies in the necessary descriptive data for inclusion in the type design the other configurations of the same engine type for which approval is requested and shows that the change is compatible with the other configurations.[70]

Neither of these C.F.R. sections directly govern the specific contents of the AFM or AFMS.  These regulations stand for the proposition that certain changes need to be reviewed and approved by the FAA—however, Defendants have made no showing that Congress or the FAA have promulgated specific rules relating to AFM or AFMS contents.  This contrasts with the regulations governing passenger warnings in *Montalvo*.  The *Montalvo* regulations specifically governed the "familiar litany of warnings—[that] seatbelts should be worn low and tight around the hips; the seat cushion can be used as a flotation device[.]"[71]  Defendants have cited nothing but two general regulations governing certification of changes in the type design, which the Court finds is not a set of

---

[69] 14 C.F.R. § 21.95.

[70] 14 C.F.R. § 21.97.

[71] *Martin*, 555 F.3d at 810 (citing *Montalvo*, 508 F.3d at 473); *see* 14 C.F.R. § 121.571 (Briefing passengers before takeoff) (delineating the specific warnings that passengers must receive before takeoff).

"pervasive regulations."[72]  Just like the court in *Martin*, which rejected the argument that general adherence to the "federal certification process" is enough to find federal preemption, here the Court reaches the same conclusion.[73]  It is not enough for Defendants to argue that the AFM or AFMS are part of the STC certification process and therefore Plaintiffs' claims must be preempted.

### B. *Federal Preemption: GARA*

Defendants argue that Plaintiffs' claims are barred because the modifications made to the subject plane do not trigger the "rolling trigger date" and that the accident in this case happened "more than eighteen years after the initial transfer of the aircraft."[74]  As discussed below, the Court disagrees and finds that GARA does not preempt Plaintiffs' claims.  It therefore **GRANTS**

---

[72] By way of additional example, the Court also finds *Ventress* relevant to its analysis.  There, the Ninth Circuit found that "pilot qualifications and medical standards for airmen" were "pervasively regulated."  *Ventress*, 747 F.3d at 721.  The court referenced the following regulations:

> Specifically, the FAA authorizes the agency to issue airman certificates to individuals who are qualified and physically able to perform the duties related to the certified position. *See* 49 U.S.C. § 44702–44703. Absent such a certificate, an individual may not serve as an airman for any civil aircraft. 49 U.S.C. § 44711. Subject to limited exceptions not applicable here, the agency requires an airman to obtain a medical certificate. 14 C.F.R. § 61.3. The agency has delegated the power to deny or issue such medical certificates to the Federal Air Surgeon. 14 C.F.R. § 67.407. The Federal Air Surgeon, in turn, is authorized to conduct medical examinations of medical certificate applicants to determine whether those applicants meet certain medical standards. *Id.* § 67.407(a)(1). The agency has promulgated detailed FARs [federal aviation regulations] regarding the issuance of medical certificates for airmen. *See* 14 C.F.R. § 67.1–67.415. Among these are FARs governing medical standards for mental, neurological, and general medical conditions. *See* 14 C.F.R. § 67.101–67.113; 67.201–67.313.

*Ventress*, 747 F.3d at 721–22.

The Court finds that the regulations cited by Defendants in this case are not remotely analogous to the ones at issue in *Ventress*.

[73] *Martin*, 555 F.3d at 811.

[74] Dkt. 221 at 11–12.

14

Plaintiffs' Motion to preclude Defendants from asserting an affirmative defense on a basis of GARA.

GARA was Congress' attempt to reduce the "enormous product liability costs that our tort system had imposed upon manufacturers of general aviation aircraft."[75] It established "an 18–year statute of repose for civil actions against manufacturers[.]"[76] However, the 18-year period "begins anew" if death or injury to Plaintiffs was "caused by any 'new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft.'"[77] Plaintiffs argue that the 18-year period began in 2014, when the short takeoff and landing ("STOL") Kit and TTC engine conversion were installed in the aircraft and that those modifications "caused the injuries and deaths at issue."[78] Defendants argue that the changes made to the subject plane were only "modification[s] of the engine system" and heavily rely on the California Court of Appeal case *Hiser* for the proposition that "replacement of a few parts of a larger system" does not start the GARA rolling limitation period anew.[79]

The Court finds that GARA does not bar Plaintiffs' claims. First, the STOL Kit and engine conversion are both substantial enough to trigger a new 18-year period *for those parts*. Plaintiffs' theory throughout this case has been that the STOL Kit and engine conversion were defective and

---

[75] *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1084 (9th Cir. 2001).

[76] *Caldwell*, 230 F.3d at 1156.

[77] *Id.* (citation omitted).

[78] Dkt. 190-1 at 11–12.

[79] Dkt. 221 at 14; *Hiser*, 111 Cal.App.4th at 650.

substantial factors in causing the subject accident.[80]  The STOL Kit, and especially the engine conversion, were not simply "replac[ing] a few parts" of the plane, but squarely "new component[s] [or] system[s]" that would trigger the new limitations period, as contemplated by GARA.[81]  As defense expert Robert Carducci states in his expert report, the engine conversion "is based on the removal of the original Pratt and Whitney R-1340 piston engine of 600 hp and its replacement with the Honeywell (Garrett) Model TPE-331-10 turbine engine rated at 900 hp and the associated Hartzell Model HC-B4TN-5NL propeller[.]"[82]  Carducci further states that the STOL Kit modification changed the "leading edge [] based on a contoured or drooped leading edge which improves the low speed characteristics of the wing by delaying separation of the boundary layer over the top surface of the wing.  This delays the aerodynamic stall[.]"[83]  Plaintiffs' expert John Cochran corroborates the magnitude of the engine conversion, opining that "[t]he [TTC] modifications are very significant because they replace a complete system, the accident aircraft's original propulsion system."[84]  While these changes necessarily interact with other unchanged components of the subject plane, the record shows that each constitutes a "new component, system, subassembly, or other part which replaced another component, system,

---

[80] *See, e.g.,* Dkts. 1 at 3 ¶¶ 3-4, 12–15 (Complaint) (Counts II & III); 338 at 3 ¶¶ 3-4, 10–14 (Counts II & III).

[81] *See* Pub. L. No. 103–298, 108 Stat. 1552 (1994), *as amended by* Pub. L. No. 105–102, § 3(e), 111 Stat. 2215 (1997);*id.* § 2(a)(2).

[82] Dkt. 170-17 at 6 (Carducci Expert Report).

[83] *Id.* at 13.

[84] Dkt. 204-2 at 11 (Cochran Expert Report).

subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage . . . ."[85]

Second, the Court finds that *Hiser*, cited by Defendants, is distinguishable. In *Hiser*, the plaintiff-widow of a helicopter pilot sued the manufacturer, arguing that the helicopter crash and her husband's death were caused due to a "defective fuel transfer system[.]"[86] The decedent pilot was a seasonal pilot for a helicopter company.[87] The subject helicopter was manufactured and delivered to the company more than 18 years before the accident.[88] However, the company subsequently made changes to the fuel system and installed a kit, recommended by the manufacturer, that included "new parts to replace the fuel flow switches and to relocate the in-line filters, along with detailed instructions to implement the changes."[89] The goal of the modifications was to reduce flameouts and "make the system more reliable."[90] The plaintiff argued that the "original design of the system has been replaced with a newly designed system, even though all original components of the system [had] not been replaced with new components."[91] The defendant-manufacturer argued that the plaintiff's complaint was not limited to the modifications,

---

[85] *See* Pub. L. No. 103–298, 108 Stat. 1552 (1994), *as amended by* Pub. L. No. 105–102, § 3(e), 111 Stat. 2215 (1997); *id.* § 2(a)(2).

[86] *Hiser*, 111 Cal. App. 4th at 643.

[87] *Id.* at 644.

[88] *Id.* at 646.

[89] *Id.* at 647. The kit installation, or retrofit, took place in 1982, less than 18 years before the accident. *Id.* at 659.

[90] *Id.* at 649 (internal quotations omitted).

[91] *Id.*

17

but rather, focused on "the original design . . . which [was] not modified by the . . . retrofit."[92]  The court sided with the manufacturer and concluded that "replacement of less than all the components of a system does not trigger a new limitation period under GARA with respect to defects in components of the system not replaced."[93]  Unlike in *Hiser*, where the plaintiff alleged that the fuel system was defective, including changed and unchanged component parts, here Plaintiffs allege that the STOL Kit and engine conversion were defective and caused the subject accident.[94]  A brand new STOL Kit and engine were installed on the subject plane and there was no intermingling of old and new parts.[95]  Accordingly, the Court finds that *Hiser* is distinguishable. Plaintiffs' claims are not preempted by GARA.

### C.  Timmons Report

For the following reasons, Plaintiffs' Motion to exclude certain of Timmons' testimony, construed as a Motion in Limine, is **GRANTED in part** and **DENIED in part**.  With one exception, the Court finds that Timmons is qualified and that his proffered testimony meets the *Daubert* standard, namely, the testimony is both reliable and relevant in this case.

---

[92] *Id.* at 648.

[93] *Id.* at 651.

[94] *See, e.g.*, Dkts. 1 at 3 ¶¶ 3-4, 12–15 (Counts II & III); 338 at 3 ¶¶ 3-4, 10–14 (Counts II & III).

[95] Defendants appear to advance a definition of "system" that would render GARA § 2(a) meaningless, since in their view the relevant "system" is the full interlocking network of features that make the plane fly (which would include the STOL Kit and engine conversion, but also other unchanged features).  Dkt. 221 at 14.  The most natural consequence of Defendants' position is that GARA would preempt all modifications outside of the original 18-year limitations period, unless the entire network were rebuilt.  The Court rejects this position.

18

Timmons was retained based on his "experience in aircraft design, flight testing and certification of Normal and Transport category airplanes and rotorcraft."[96] Timmons has an extensive CV, which includes working as an aeronautical engineer for "over 52 years . . . in the design, development, and FAA certification of commercial aircraft."[97] He has a degree in Aeronautical Engineering and served as an FAA Designated Engineering Representative from 1977 to 2017.[98] He has worked on numerous FAA certification programs over the past several decades.[99] Although he has an engineering background, his specialty is in assisting clients with the FAA certification process.[100] Timmons provides analysis and opinions on topics such as the accident sequence, FAA oversight, aircraft design and manufacturing responsibilities of TTC, responsibilities of Rainbow King Lodge, rebuttals to Plaintiffs' experts, and ultimate opinions on the cause of the accident.[101]

Plaintiffs argue that defense expert Timmons "should not be allowed to testify to preemption."[102] Plaintiffs summarize portions of Timmons' expert report, where he discusses the "[a]ircraft design and manufacturing responsibilities" of TTC, based on FAA requirements, and argue that it "is thus apparent that Timmons' entire opinion is based upon the certification by the

---

[96] Dkt. 212-5 at 1 (Timmons Expert Report).

[97] *Id.* at 34.

[98] *Id.*

[99] *Id.* at 35.

[100] *Id.* at 34.

[101] *See id.* at 1.

[102] Dkt. 190-1 at 7. Plaintiffs' attempt to exclude Timmons' testimony is properly brought as a motion in limine, and the Court construes it as such.

FAA that the aircraft met design standards."[103]  Plaintiffs seek to exclude Timmons' testimony on two bases.  First, they argue that "mere FAA certification does not resolve the design/warning issues."[104]  Second, they argue that Timmons' testimony "fails to meet the *Daubert* standards" because he conducted no "independent analysis."  As a result, the "testimony regarding the safety of the aircraft as designed by [TTC] and the adequacy of the supplemental flight manual issued by [TTC] should be excluded."[105]

In response, Defendants first argue that "plaintiffs do not challenge Timmons' qualifications."[106]  Timmons has "conceived of, drafted, engineered, flight tested and successfully presented for FAA certification over 60 [STCs]."[107]  They next argue that "nothing requires that an expert conduct independent testing in every case."[108]  Timmons did not limit himself "to just TTC's development and certification of the turbine engine installation but explored the activities surrounding the accident flight to see if airplane performances and/or flight characteristics were involved."[109]  Specifically, Defendants note that Timmons reviewed the "documentation underlying the conception, development and testing of the STC" at issue.[110]  Timmons reviewed

---

[103] *Id.* at 7–9.

[104] *Id.* at 10.

[105] *Id.* at 11.

[106] Dkt. 212 at 13.

[107] *Id.* at 16 (emphasis omitted).

[108] *Id.*

[109] *Id.* at 18 (citing Dkt. 212-6 at 2–3 (Timmons Aff.)).

[110] *Id.* at 21.

"the flight test records for the float equipped DHC-3" Otter.[111]  Finally, he "notes in his report that controlling authorities . . . agreed that applicable certification requirements had been met[.]"[112]

First, the Court finds that Timmons is qualified.  Timmons is an aeronautical engineer with over 50 years of experience.[113]  He specializes in the FAA certification process and has worked on a wide range of STC modifications and regulatory certifications.[114]  Plaintiffs do not contest Timmons' qualifications or CV, instead focusing on the methodology, relevancy, and credibility of his expert analysis.[115]

Next, the Court finds that Timmons' methodology is reliable.  Timmons reviewed 48 documents including government regulations, NTSB records, flight test data, deposition testimony, and other sources in order to reach his conclusions.[116]  In his report, he applies his engineering background and experience to evaluate the "error chain" that contributed to the accident.[117]  He evaluates the sufficiency of the flight testing conducted on the Otter floatplane and issues relating to the center of gravity.[118]  With regard to the FAA certification process, his core competency, he explains the FAA standards and process for certification, and in his deposition

---

[111] *Id.* at 22.

[112] *Id.* at 26.

[113] Dkt. 212-5 at 34.

[114] *Id.* at 34–35.

[115] *See* Dkt. 190-1 at 9–10.

[116] *See* Dkt. 212-5 at 32–33.

[117] *See id.* at 10–13.

[118] *Id.* at 13–17.

notes that he was checking to see if "[i]t was a typical STC program."[119]   Plaintiffs argue that

Timmons should have done more—such as flight testing—and that his analysis is not sufficiently

rigorous.[120]   These objections, however, go to the weight of Timmons' opinions, not their

admissibility.[121]

Finally, the Court finds that Timmons' proffered opinions are relevant to the theories at

issue in this case.  Timmons analyzes the changes made to the plane by TTC and RAC and reaches

conclusions about whether those changes were a contributing cause to the crash.[122]   He also

discusses the regulatory scheme applicable to parties in this case, and, specifically, the process for

obtaining approval of an STC.[123]   Timmons' testimony would be helpful to the jury in evaluating

the cause or causes of the accident and the process by which STCs are obtained.

Plaintiffs are correct to point out that it would be inappropriate for Timmons to reach legal

conclusions on issues of federal preemption or whether TTC is liable for Plaintiffs' claims.[124]

However, the Court does not view Timmons' report as reaching the ultimate legal conclusions on

---

[119] Dkt. 190-1 at 9 (citing Dkt. 190-2 at 59:11-13 (Timmons Tr.)).

[120] Dkt. 190-1 at 10.

[121] *See Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1018 n.14 (9th Cir. 2004) ("'[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'") (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)); *In re Crash of Aircraft N93PC*, No. 3:15-cv-0112-HRH, 2020 WL 1956823, at *6 (Dkt. 365) (denying defendants' motion in limine and reasoning that many of the objections to the expert testimony can be addressed on cross examination).

[122] Dkt. 212-5 at 30–31.

[123] *Id.* at 18–22.

[124] *See Hangarter*, 373 F.3d at 1016 (expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law).

22

these topics.  Instead, it discusses the regulatory framework and whether the parties' behavior fell within industry norms.  The only exception to this observation, however, is Timmons' fifth opinion as to the cause of the accident, where he states "[t]herefore, the entire responsibility for this accident, and subsequent loss of life, rests completely on Rainbow King Lodge, Inc.['s] decision making and *illegal operation* of airplane N928RK on September 15, 2015."[125]  While Timmons may discuss regulations governing the subject plane and other facts in the record, his ultimate conclusion that Rainbow King Lodge *illegally operated* the subject plane is an impermissible legal conclusion and must be excluded.[126]

## V.    CONCLUSION

Accordingly, for the above reasons, Plaintiffs' Motion for Partial Summary Judgment at Docket 190 is **GRANTED in part** and **DENIED in part** as follows:

1. The Motion is **GRANTED** as to Plaintiffs' argument that their claims are not preempted by FAA regulations, and thus, Defendants should not be permitted to assert an affirmative defense on this basis;

2. The Motion is **GRANTED** as to Plaintiffs' argument that their claims are not preempted by GARA, and thus, Defendants should not be permitted to assert an affirmative defense on this basis; and,

3. The Motion, construed in part as a Motion in Limine, is **GRANTED in part** and **DENIED in part, without prejudice,** as to defense expert Timmons' testimony.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 12th day of February, 2021.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[125] Dkt. 212-5 at 31 (emphasis added).

[126] While the Court does not find the balance of Timmons' report inadmissible at this time, Plaintiffs may bring a renewed motion to challenge to Timmons' testimony at trial.

23